**STATE ex rel. Adrian KINDER, Relator,**

v.

**The Honorable Maura B. McSHANE, Judge, Circuit Court of St. Louis County, Missouri, Respondent.**

No. SC 84082.

Supreme Court of Missouri, En Banc.

Oct. 22, 2002.

Arthur G. Muegler, Jr., St. Louis, for Relator.

S. Bart Calhoun, Asst. Prosecuting Atty., Clayton, for Respondent.

PER CURIAM.

This Court issued a preliminary writ of prohibition to determine whether the trial judge abused her discretion in refusing to

accept Adrian Kinder's attempted waiver of a potentially serious conflict of interest. This issue arose when Adrian's attorney, Arthur Muegler, represented Adrian's father, Kevin Kinder, at a deposition in this very case, a deposition at which Kevin gave testimony that the prosecution says will be key to its prosecution of Adrian for the murder of his mother. The prosecutor then moved to require Muegler to withdraw from representing Adrian because of this potential conflict. The trial court granted the motion over the objection of Adrian and his father, Kevin.

While a defendant's knowing and intelligent waiver of a potential conflict of interest should and will in most instances be respected, on the facts of this case Adrian's purported waiver was not valid. More specifically, the record does not show that either Adrian or his father, Kevin, gave a knowing waiver of the potential conflict of interest prior to Kevin's deposition, or even that they really understood that the potential for a conflict would result if Muegler undertook to represent Kevin at the state's deposition of him.

Moreover, where the potential for a conflict of interest at trial is of the magnitude shown on this record, the trial court must look beyond a defendant's purported waiver to determine whether continued representation will deprive the defendant of the right to a fair trial. Here, the trial court determined that the potential for conflict was too great and refused to accept Adrian's attempt to retroactively validate his counsel's dual representation. This ruling was not an abuse of discretion on the facts of this case. For these reasons, this Court's preliminary writ of prohibition is quashed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of September 9, 2000, the body of Sherri Kinder was discovered after police and firefighters responded to a fire at the residence she shared with her husband, Kevin Kinder, their 16–year old son, Adrian Kinder, and their toddler son. After the fire was contained, authorities located Sherri, shot to death, in an upstairs room. Adrian was outside the residence when authorities first reached the scene. Kevin was not at home, reportedly having left the house around 1:30 p.m. to spend the night at a local motel to catch up on work.

Adrian was taken into custody and charged with a violation of the juvenile code. Kevin hired Muegler to represent Adrian in the juvenile proceedings. On November 2, 2000, the juvenile division certified Adrian to stand trial as an adult, and he was subsequently charged with first-degree murder, armed criminal action, and first-degree arson related to the death of his mother, Sherri. Muegler continued to represent Adrian in the criminal case.

On July 19, 2001, the State deposed Adrian's father, Kevin, after endorsing him as a prosecution witness. Muegler attended the deposition as counsel for both Kevin and Adrian, advised Kevin in answering the prosecutor's questions, and objected to various questions. One of those questions was whether Kevin had waived any conflict of interest in retaining Muegler to represent both him and Adrian, a question that Muegler instructed him not to answer.

At the deposition, Kevin acknowledged that shortly after learning of the events surrounding the fire at his home, he informed the police that he thought Adrian had killed his wife. He stated that everyone told him that Adrian committed the murder and, so, he "made an assumption that I guess he did it." He also indicated that he believed if he had been home,

Adrian would have killed him, too. Kevin further testified that:

- When Adrian was living at home and not in juvenile custody, his behavioral problems were such that his parents had problems controlling him;
- Sometime before the events of September 9, 2000, Kevin requested the juvenile division to remove Adrian from his home "because he was hanging around with the wrong people and I wanted him to go to the military when he was 17 and I didn't want anything to preclude him from being able to get in;"
- Kevin did not think being grounded was a severe enough punishment for Adrian's behavior problems, so he usually reported him to the juvenile authorities instead;
- Once when Kevin and Adrian were in the house and both were angry, Kevin swung his walking stick like he was going to hit Adrian, who ran out of the house and kicked his father's windmill to pieces. Kevin then called the police and had Adrian sent to juvenile detention;
- On another occasion, Adrian was involved in a physical altercation with Sherri, during which he grabbed her wrist and refused to release her;
- Kevin only trusted Adrian "to a point" because Adrian had lied in the past about stealing things from his father and selling them to a pawn shop;
- Adrian only admitted stealing when he was caught red-handed;
- Kevin kept a variety of handguns in the house in locked safes, but he kept the keys on his key ring and left the key ring on the top step with the family's other keys whenever he came home;
- Kevin also kept "long guns," including a .16–gauge shotgun, which mysteri-

ously had a .20–gauge shell jammed into it, in a safe adjacent to the master bedroom;
- Sherri called Kevin one day at work because, when she came home, Adrian was in the computer room with a shotgun and "was going to shoot his head off;"
- In January 2000, Kevin decided to take an inventory of his guns due to the thefts around the house, in order to make sure that neither Adrian nor any of his friends had stolen a gun;
- Kevin never visited Adrian in jail;
- Kevin confirmed that two items found in Adrian's possession at the time of his arrest were the keys to Sherri's car and Kevin's checkbook and that Adrian did not have permission to drive the car (nor did he have a driver's license) or permission to possess the checkbook.

On August 2, 2001, the State filed a motion to disqualify Muegler as Adrian's attorney due to a conflict of interest based on Muegler's representation of both the defendant, Adrian, and a key prosecution witness, Kevin. At a hearing on the motion, both Adrian and Kevin testified that Muegler did not discuss any conflict of interest issue with them prior to the deposition, but both stated that there was no such conflict of interest. The motion court disagreed, stating, "I don't see how you can represent a key witness to the case, to the state's case, and at the same time represent the defendant in the case." The motion court then granted the state's motion to disqualify Muegler due to the "appearance of a conflict of interest" and the "potential conflict of interest ... [that] could arise in the middle of the trial." To challenge the ruling, Adrian filed a petition for writ of prohibition in the Court of Appeals, Eastern District, which was de-

nied. He then sought a writ in this Court. This Court issued its preliminary writ of prohibition.

## II. ANALYSIS

### A. Standard of Review.

Prohibition is a discretionary writ that lies only to prevent "an abuse of judicial discretion, to avoid irreparable harm to a party, or to prevent exercise of extra-jurisdictional power." *State ex rel. Linthicum v. Calvin,* 57 S.W.3d 855, 857 (Mo. banc 2001). The general rule is that, if a court is "entitled to exercise discretion in the matter before it, a writ of prohibition cannot prevent or control the manner of its exercise, so long as the exercise is within the jurisdiction of the court." *State ex rel. K-Mart Corp. v. Holliger,* 986 S.W.2d 165, 169 (Mo. banc 1999).

### B. Law Governing Waiver of Conflicts of Interest.

The leading Missouri case addressing conflicts of interest that may arise when an attorney represents both a criminal defendant and a prosecution witness in the same case is *Ciarelli v. State,* 441 S.W.2d 695 (Mo.1969). Ciarelli was accused of receiving golf equipment stolen from a country club by Victor Osborne and another. While Ciarelli and Osborne were originally represented by different counsel, due to illness Ciarelli's prior attorney withdrew and attorney Robert Harrington represented Ciarelli at trial. Either Harrington or one of his partners also represented Osborne. Osborne gave testimony adverse to Ciarelli as a witness for the state at the trial. Ciarelli was convicted.

On appeal, Ciarelli argued that Harrington's representation of both him and a prosecution witness created an actual conflict of interest and that conflict in turn denied him his Sixth Amendment right to counsel. This Court agreed with defendant that:

It has been ruled in numerous federal cases that a defendant in a criminal trial is denied his constitutional right to counsel if his attorney represents conflicting interests without his knowledge and assent.

*Id.,* 441 S.W.2d at 697. This Court then held that, given this Sixth Amendment right to counsel, "An attorney who represents both the defendant and a prosecution witness in the case against the defendant is representing conflicting interests." *Id.*

As this Court noted, recognition that a conflict of interest exists does not end the inquiry, for a conflict of interest may in many circumstances be waived. The waiver must be knowing, of course, for, "[t]here can be no doubt that, insofar as this problem [of a conflict of interest] is concerned, the fact that an attorney is of the defendant's own choosing is of no significance, absent knowledgeable consent of the accused". *Id.* at 697. But, *Ciarelli* found that defendant had gone to trial aware of the conflict and had knowingly waived it. It also found that Ciarelli's counsel in fact did effectively represent him, conducting a vigorous defense and attempting to impeach Osborne. It therefore rejected the after-the-fact attempt to void the guilty verdict based on the conflict of interest.

Nineteen years later, the United States Supreme Court elucidated the basis on which a waiver of an actual or potential conflict of interest should be accepted or rejected in *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), still the leading United States Supreme Court case on the issue of an attorney's conflict of interest in the case of dual representation. Wheat was charged in a complex federal drug case. A co-defendant represented by attorney Eugene Ire-

dale was acquitted on one charge and obtained a favorable plea arrangement on another, although that agreement was not yet final.

Apparently impressed, defendant Wheat moved to be allowed to dismiss his counsel and retain Iredale. The prosecutor noted that the co-defendant who had pleaded guilty was likely to be a prosecution witness in Wheat's trial, and that if this occurred, or if the co-defendant withdrew his plea and himself went to trial, attorney Iredale's joint representation of them would create a conflict of interest. The trial judge denied the motion, noting that it was made very shortly before trial was to begin. The Ninth Circuit affirmed, and the Supreme Court granted certiorari to address "when a district court may override a defendant's waiver of his attorney's conflict of interest." *Wheat,* 486 U.S. at 158, 108 S.Ct. 1692.

The Supreme Court began by explaining that the Sixth Amendment secures the right to effective assistance of counsel in order to ensure that criminal defendants receive a fair trial, and that for this reason:

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat,* 486 U.S. at 159, 108 S.Ct. 1692. From this it determined that:

> While 'permitting a single attorney to represent codefendants ... is not *per se* violative of constitutional guarantees of effective assistance of counsel,' *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426, ... (1978), a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.... As we said in *Holloway:*
>
>> Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.... [A] conflict may ... prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another.
>> 435 U.S. at 489–490, 98 S.Ct. 1173.

*Wheat,* 486 U.S. at 159–60, 108 S.Ct. 1692 (quoting *Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). The Court noted that Fed. R.Civ.P. 44(c) reflects these constitutional principles,[1] but also stated that, "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the

---

1. Fed.R.Civ.P. 44(c) governs joint representation of two defendants:

    Whenever two of more defendants have been jointly charged ... or have been joined for trial ... and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation." *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692.

Applying these principles, *Wheat* stated that a court may reject a waiver in the face of an *actual* conflict of interest. Because it is often difficult to predict prior to trial whether an actual conflict will arise, however, the Court also stated that:

> The district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Wheat,* 486 U.S. at 163, 108 S.Ct. 1692. *Wheat* found that the trial court had not exceeded the latitude allowed it in refusing to accept the waiver in that case.

### C. A Valid Waiver of the Potential Conflict was not Given Here.

The principles explicated in *Ciarelli* and *Wheat* govern here. Applying these principles, this Court concludes that the trial judge in this case also did not exceed the latitude given her under the Sixth Amendment in refusing to accept Adrian's purported waiver of the conflict of interest. As set out in detail *supra,* the record shows that: (1) the State has said on the record that Adrian's father, Kevin, will be a key prosecution witness, giving testimony essential to its case; (2) it appears Kevin's testimony at trial will track that which he gave at the deposition at which he was represented by Muegler; (3) for the reasons set out in detail below, that testimony will be adverse to Adrian's interests unless its credibility is undermined; (4) the record to date does not indicate an alibi for Adrian's father, Kevin, during the

time of the murder; but rather shows that he claims to have been working alone in a room he rented at a nearby hotel and did not answer his pager when called; (5) yet, Adrian says there is no conflict of interest and therefore nothing to waive because he believes his dad will tell the truth, and (6) Muegler says that Kevin's testimony goes only to uncontested issues or is favorable and he does not see a conflict of interest or a serious potential for one.

In these circumstances, although Muegler avers he will not represent Kevin when the latter is called to testify at trial, the potential for a serious conflict of interest arising at that time, because of the need to impeach or throw suspicion on Kevin, or otherwise, is great. If this occurs during trial, a mistrial would result, for Muegler would be forced to withdraw rather than impeach his own former client, and Adrian would require new counsel be retained or appointed for him. It was to avoid this likelihood that the trial court rejected Adrian's purported waiver and disqualified Muegler. She did not abuse her discretion in so holding.

In so holding this Court recognizes that this issue is being raised by the prosecutor, whose role as the party adverse to defendant makes him an unlikely protector. Indeed, the state admits its concern is to avoid a claim of ineffective assistance after trial, not to act to protect Adrian's interests. Where, as here, however, defense counsel does not believe that a real or potential conflict of interest exists, then someone other than defense counsel would almost have to be the one to raise it. And, it should not be forgotten that, under our law, the prosecutor has a "duty to serve justice, not just win the case". *State v. Storey,* 901 S.W.2d 886, 901 (Mo. banc 1995). Nonetheless, the fact that the prosecutor is not acting for or representing

defendant's interests highlights the importance of defendant receiving the advice of independent counsel before agreeing to a waiver and of the key role the court must play as neutral fact-finder and decision-maker in sorting out the issues raised by the conflict of interest claim.

In so holding, this Court also strongly emphasizes the need to accord an accused the right to select his or her own counsel. In most cases, this will include the right to make a knowing waiver of a potential conflict of interest, particularly where the potential conflict involves representation of a witness prior to the case in question, representation of a peripheral witness, or a conflict that arose due to the conduct of someone other than defendant and his counsel.

■ But, this Court rejects the suggestion that, in all but the rarest cases, once a defendant says that he waives any conflict, the court's involvement must end. To the contrary, where the conflict of interest is an actual one, or the potential for a conflict of interest at trial is a serious one, such as is the case here, then "such a waiver, . . . does not necessarily resolve the matter, for the trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver." *United States v. Stewart*, 185 F.3d 112, 122 (3d Cir.1999), *cert. denied*, 528 U.S. 1063, 120 S.Ct. 618, 145 L.Ed.2d 512 (1999), *quoting, United States v. Moscony*, 927 F.2d 742, 749 (3d Cir.1991).

■ The best way for the trial court to fulfill its role would be for the court to timely hold a hearing on the issue of the conflict, either on its own motion or on motion of one of the parties, prior to the advent of the dual representation, or as soon thereafter as the conflict or potential conflict comes to the attention of counsel or the court.[2] At the hearing counsel could present the facts regarding the conflict and defendant's desire to waive it, and counsel and the court could question defendant and other relevant persons about the purported waiver, much as occurs when a defendant indicates he or she wants to waive the right to counsel at trial but has not signed a written waiver as set out in section 600.051, RSMo 2000. *See, e.g., May v. State*, 718 S.W.2d 495 (Mo. banc 1986); *State v. White*, 44 S.W.3d 838 (Mo.App. W.D.2001).

■ Appointment of a public defender to give independent advice on this issue would be appropriate if the defendant qualifies for such appointment. If not, then the court should recommend to defendant that he or she seek the advice of other independent counsel. The court should consider whether such counsel was available in considering the knowing nature of the waiver, and it is all the more important to have such counsel when the defendant is a juvenile. The court can then make the determination whether to accept the waiver under the principles set out herein.

Here, of course, no such inquiry occurred prior to the waiver. Rather, as discussed below, the dual representation occurred before the conflict was even explained to or a waiver sought from either client, and no independent counsel was appointed or consulted.

2. Delay by a party in obtaining a knowing waiver or in requesting a hearing until after the conflict-causing event has already occurred—here, for instance, until after Kevin's deposition—would be relevant to the court's ultimate determination whether a serious potential for conflict of interest exists and whether it can be waived.

This is particularly of concern here, for the record makes it evident that the potential for a serious conflict of interest at trial is high. While Adrian's father, Kevin, has not been charged with a crime, Adrian, a juvenile at the time of the crime and a minor at the time of the deposition, has been accused of the crime of killing his mother. Adrian's father has been listed as a witness for the State because he gave a statement shortly after the murder, and again stated at his deposition, facts that demonstrate conflict between Adrian and his parents, a belief that Adrian could be violent, access by Adrian to weapons, and lack of veracity on the part of Adrian. Clearly, a defense counsel would normally want to discredit as much of this testimony as possible.

In addition, because Kevin was in a hotel room, unseen by others, during the murder, and failed to return numerous pages that night, a potential defense strategy might well be to turn suspicion toward Kevin himself. Yet, inasmuch as Kevin is at least a former client of Muegler, cross-examination by Muegler on these issues would be impossible, and Adrian would thus be denied these lines of defense.

Muegler nonetheless states that he sees no actual or serious potential for a conflict of interest. From this one would presume that he does not foresee relying on such defenses at Adrian's trial. Although it is unclear how Muegler can fully and effectively defend Adrian without using such defenses, this Court does not need to reach the state's claim that he is engaging in this dual representation in order to set up a later claim of ineffective assistance of counsel. Whether he is taking this position for that reason, or because Adrian said he would never want to discredit or cast suspicion on his father, or whether he has yet some other motivation, is not dispositive. Assuming that Muegler in good faith believes that he can represent Adrian effectively at trial despite his pre-trial representation of both Adrian and Adrian's father, he simply cannot now know what strategies may ultimately be in Adrian's best interests at the trial. For, as the Third Circuit noted in *Stewart:*

[N]otwithstanding an attorney's pretrial assurances otherwise, a defendant's trial strategy is not fixed. Thus, if an attorney has been unsuccessful in bringing out the necessary points in support of a contemplated defense, the attorney may change his strategy to provide the defendant with the best possible defense. Accordingly, the district court could not accept Stewart's assurances that he would not pursue an alternate strategy at trial. In fact, by so doing, the court would have been opening the door for a manufactured mistrial or a possible ineffective assistance of counsel claim on appeal.

185 F.3d at 122. Muegler cannot know what defenses he will ultimately decide he must use at trial and cannot reject any such defenses out-of-hand before trial because they would be distasteful to his client or because, before trial, other approaches appear to be preferable.

This concern is rendered all the more serious here because of the fact that the other person whom Muegler has represented, whom the State says will be one of its key witnesses, necessary for it to make its case, and upon whom the defense might potentially want to throw suspicion, is Adrian's own father, Kevin. He is paying for Adrian's defense, and stands in a fiduciary relationship with Adrian, who was a juvenile at the time of the crime and a minor at the time of the deposition of his father (although he is now 18 and is being tried as an adult). In other words, the two people to whom Adrian could look for counsel and advice as to whether to waive

the conflict were his father, the alternate potential suspect who offered deposition testimony detrimental to Adrian's defense, and his attorney, Muegler, who also represents Adrian's father and who is being paid by Adrian's father to represent Adrian.[3]

Further, Adrian's testimony at the hearing below makes it clear that he did not waive the potential conflict, nor was its existence explained to him in a way he could remotely understand, prior to the deposition, and Kevin likewise testified it was not explained to him prior to his deposition. Indeed, even by the time of the hearing, Adrian did not appear to understand the nature of the potential conflict, for he testified that he had no trouble with Muegler representing both him and his father because he was sure his father would tell the truth. Adrian's belief in his father's honesty does not necessarily bear any relevance to whether that honest testimony is adverse to him, however.

Adrian's lack of understanding of the potential adversity of his father's testimony may in part have been caused by his counsel's own stated belief that Kevin's testimony is not adverse to Adrian, for Muegler stated at the hearing below that "if the Court goes through the Kevin Kinder deposition . . . the Court will note that Kevin Kinder did not testify to any fact

which was adverse to the interest of this defendant, Adrian Kinder." This Court's reading of the deposition leads it to the opposite conclusion, however; it is potentially devastating to Adrian, and at trial is likely, as the state anticipates, to be a key part of the state's case.

■ Counsel for Adrian suggests that Rule 4–1.7, a part of the Rules of Professional Conduct nonetheless leaves it to the attorney to decide whether the attorney can reasonably represent both clients.[4] But, while this rule is intended to address many of the same concerns that are addressed by the Sixth Amendment principles discussed here, the rule is addressed only to the attorney's ethical obligations to his or her client. It runs parallel to, rather than supplants, a trial judge's obligation to protect defendant's Sixth Amendment rights by rejecting an invalid waiver.

Counsel for Adrian also suggests that the problems with the waiver that have been identified resulted because the hearing held below did not sufficiently focus on why Adrian should be allowed to waive the potential conflict, and that a new hearing would satisfy the concerns here raised.

While this approach might be adequate in another case, it is inadequate on these facts. Any lack of in-depth inquiry at the

3. The mere fact that the father paid Muegler does not itself create a conflict, *see* Rule 4–1.6, and it is not unusual for a parent to pay for the defense of a child. But, where, as here, the father is also a key prosecution witness and potentially an alternative suspect, then it is not inappropriate to consider this circumstance in determining the validity of the waiver.

4. Rule 4–1.7 states in relevant part:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the rela-

tionship with the other client; and (2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless (1) the lawyer reasonably believes the representation will not be adversely affected; (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

hearing below into whether the potential conflict was one that could be waived was not due to a failure to inquire into this issue, but was due to Adrian and Muegler's insistence that there was no conflict or potential conflict and, therefore, there was nothing to waive. If the defendant denies there is a conflict, and denies even understanding what a conflict is, it is impossible to question him at length about whether requirements for waiver of that conflict have been met.

The court below was also entitled to consider the fact that Adrian's lack of understanding appears to have resulted from Muegler's apparent failure to explain to Adrian, even by the time of the hearing below (much less prior to the deposition), exactly what constitutes a conflict of interest. For, on the numerous occasions that the State tried to inquire into whether Adrian thought a conflict of interest existed or could be waived, Adrian repeatedly indicated he just did not understand what was meant by a conflict of interest. As noted, he finally tried to reassure the court that he believed his father would "tell the truth" and, thus, there was no problem with the dual representation. But, this just underscored his lack of understanding that his father might be truthful yet his interests and Adrian's might still conflict. This reinforces the importance of ensuring that a client, particularly one who, like Adrian, was a minor at the time of the deposition, be told of the potential for conflict and receive independent advice as to it prior to counsel undertaking dual representation.

For these reasons, even had Adrian been asked to give, and been capable of giving a knowing waiver prior to the deposition (an issue the trial court was not timely asked to pass upon), review of the transcript of the hearing that was ultimately held convinces the Court that the trial judge did not abuse her discretion in determining that the after-the-fact attempt to explain the conflict and obtain a waiver was inadequate and in refusing to accept the waiver.

The preliminary writ of prohibition is quashed.

LIMBAUGH, C.J., WOLFF, BENTON, STITH, PRICE, TEITELMAN, JJ. and LOWENSTEIN, Sp.J., concur.

WHITE, J. not participating.