**STATE ex rel. MISSOURI PUBLIC DEFENDER COMMISSION, Cathy R. Kelly and Rod Hackathorn, Relators,**

**v.**

**The Honorable John S. WATERS and the Honorable Mark Orr, Respondents.**

**No. SC 91150.**

Supreme Court of Missouri, En Banc.

July 31, 2012.

Stephen F. Hanlon and Laura A. Fernandez, Holland & Knight LLP, Washington, D.C., J. Gregory Mermelstein, Public Defender's Office, Columbia, Stacey H. Wang, Holland & Knight LLP, Los Angeles, and Michael P. Gunn and John R. Gun, The Gunn Law Firm PC, St. Louis, for Relators.

Donovan D. Dobbs, Amy J. Fite and Benjamin J. Miller, Christian County Prosecutor's Office, for Respondents.

LAURA DENVIR STITH, Judge.

■ The Missouri Public Defender Commission petitions this Court for a writ of prohibition ordering the trial court to withdraw its appointment of the public defender's office to represent Jared Blacksher, alleging that the appointment violated 18 CSR 10–4.010 ("the rule"). That administrative rule, promulgated by the commission pursuant to its rulemaking authority under section 600.017(10),[1] adopts a "caseload protocol" that permits a district defender office to decline additional appointments when it has been certified as being on limited availability after exceeding its caseload capacity for at least three consecutive calendar months.

■ When the commission or other state agencies promulgate a rule addressing an issue within the scope of their authority, the rule must be followed unless it has been held invalid or inapplicable. *See Foremost–McKesson, Inc. v. Davis*, 488 S.W.2d 193, 197 (Mo. banc 1972). Here, the trial court did not refuse to apply the rule after finding that it was promulgated improperly or that public defenders were not overworked or that the other requirements for the rule's application were not met. In fact, as discussed below, there have been no such findings in this case, either by the trial judge or by the master later appointed by this Court. Rather, the trial court said it believed it "had no choice" but to appoint a public defender, regardless of the public defender's ability to provide competent and effective representation in another case, because to do otherwise would have violated the defendant's Sixth Amendment right to counsel, as the court could identify no other realistic mechanism by which to provide other counsel.

■ The trial court erred insofar as it believed that the Sixth Amendment requires appointment of counsel without regard to whether counsel would be able to offer competent representation. *State ex rel. Missouri Pub. Defender Comm'n v. Pratte*, 298 S.W.3d 870, 875 (Mo. banc 2009), held, and the Court here reaffirms, that the Sixth Amendment right to counsel is a right to effective and competent counsel, not just a pro forma appointment whereby the defendant has counsel in name only.

■ Further, while the Court appreciates the trial court's concerns that the alternatives of appointing private counsel or not seeking jail time will be inadequate to alleviate the public defender's case overload, a judge cannot pick which administrative rules to follow based on a personal belief that a rule, however well-intended, may not achieve its purpose. A properly promulgated administrative rule must be followed unless invalidated. While *Pratte* invalidated the portion of the rule that had permitted a public defender office to refuse categories of cases, it affirmed the general authority of the commission to issue administrative rules—an authority not questioned here. *Id.*

Moreover, while the parties litigated below whether the rule was a good or effective one, no showing was made that it was inapplicable, other than the assertion rejected in *Pratte* that the Sixth Amendment does not permit consideration of whether counsel can offer competent and effective representation as required by the rule. While a declaratory judgment action might yet be brought by which the overall validity of the rule could be considered under the standards applicable to the review of administrative rules, that case is not pre-

---

1. All statutory references, except those pertaining to section 600.042.4, are to RSMo 2000. References to section 600.042.4 are to RSMo Supp.2010.

sented here. Further, although a party properly may attack the application of 18 CSR 10–4.010 in a particular case in the future, no showing was made here that the regulation was not applicable. In these circumstances, it was error to fail to apply the rule.

■■ The trial court also erred in holding that the rule provides no realistic alternative mechanisms for handling the issue of excessive appointments. While the public defender commission's regulations cannot bind a trial judge or prosecutor directly, trial judges have inherent authority, and an inherent responsibility, to manage their dockets in a way that respects the rights of the defendant, the public and the State and that respects the obligation of public defenders to comply with the rules governing their representation. An effective means of so doing is for judges to "triage" cases on their dockets so that those alleging the most serious offenses, those in which defendants are unable to seek or obtain bail, and those that for other reasons need to be given priority in their resolution also are given priority in appointment of the public defender and for scheduling of trial, even if it means that other categories of cases are continued or delayed, either formally or effectively, as a result of the failure to appoint counsel for those unable to afford private counsel. While *Pratte* properly held that the public defender does not have the authority under sections 600.042.4(3) and 600.086 to set such case priorities, judges inherently have authority to manage their dockets in this manner.

Regardless of whether the promulgation and substance of the regulation and protocol adopted thereunder ultimately are found to be valid or invalid in whole or in part upon proper challenge, the inherent authority of courts to manage their caseloads in this manner will continue and should be utilized so as to best ensure that a defendant's constitutional rights, the defender's ethical duties and the State's right to prosecute wrongdoers are respected.

Here, because no showing was made nor finding entered that the rule was promulgated invalidly or was inapplicable under the facts of this case, the court erred in failing to apply it. The parties met and conferred, but neither the public defender nor the prosecutor reached an agreement to resolve the problem. Because the meetings were ineffective and the rule was not found invalid, the rule should have been applied and the public defender should not have been appointed to represent Mr. Blacksher.

Because, during the course of this appeal, Mr. Blacksher's case was resolved by a guilty plea, this Court makes its preliminary writ permanent only to the extent of ordering the trial court to vacate its order appointing the public defender to represent him.

## I. BACKGROUND OF RULE LIMITING AVAILABILITY OF PUBLIC DEFENDER'S APPOINTMENT

### A. General Authority of Public Defender Commission to Adopt Rules

■■■ The commission is an administrative agency created by the General Assembly. § 600.015.[2] As a creature of statute, an administrative agency's authority is limited to that given it by the legislature. *See Parmley v. Missouri Dental Bd.*, 719 S.W.2d 745, 755 (Mo. banc 1986). When an agency statutorily is authorized to en-

---

**2.** *See also* § 536.010 (defining a "state agency" as "each board, commission, department, officer or other administrative office or unit

... existing under the constitution or statute").

gage in rulemaking, "regulations may be promulgated only to the extent of and within the delegated authority" of the agency's enabling statute. *Hearst Corp. v. Dir. of Revenue*, 779 S.W.2d 557, 558 (Mo. banc 1989). The rules adopted "may not conflict with statutes," *Pratte*, 298 S.W.3d at 882, and a statute may not conflict with the constitution. *State v. Kinder*, 89 S.W.3d 454, 459 (Mo. banc 2002). Rather, "if it is at all feasible to do so, statutes must be interpreted to be consistent with the [Missouri and federal] constitutions." *State v. Stokely*, 842 S.W.2d 77, 79 (1992).

The office of state public defender is charged with providing representation to indigent defendants facing criminal charges pressed by the State.[3] The office operates under the control of the public defender commission, which is assigned various responsibilities and vested with corresponding powers necessary and convenient to fulfilling those responsibilities. § 600.015 to 600.101. The director is authorized to "administer and coordinate the operations of defender services and be responsible for the overall supervision of all personnel, offices, divisions and facilities of the state public defender system." § 600.042(4). Additionally, section 600.017(10) authorizes the commission to "[m]ake any rules needed for the administration of the state public defender system."

### B. Promulgation and Substance of 18 CSR 10–4.010

The commission promulgated 18 CSR 10–4.010 in response to mounting concern that, due to the growth in the number and complexity of cases requiring public defender services without a corresponding increase in the number of public defenders, some public defenders' caseloads had increased to a level that interfered with their ability to fulfill their constitutional, statutory and ethical obligations to represent their clients effectively and competently.

To address that concern, the commission enacted 18 CSR 10–4.010 with the express purpose of ensuring "that cases assigned to the Missouri state public defender system result in representation that effectively protects the constitutional and statutory rights of the accused." 18 CSR 10–4.0 10.[4] As an integral part of the rule, the commission is required to "maintain a caseload standards protocol identifying the maximum caseload each district office can be assigned without compromising effective representation." *Id.* at 10–4.010(1)(A). When a district office exceeds the maximum caseload standard for three consecutive calendar months, "the director may limit the office's availability to accept additional cases by filing a certification of limited availability" with the appropriate court. *Id.* at 10–4.010(2)(A). The protocol permits an office that is placed on limited availability to decline appointments in a given month once it reaches its maximum allowable caseload.[5] *See Pratte*, 298 S.W.3d at 884.

---

3. For a thorough explication of the history of Missouri's public defender system, and for a more detailed discussion of the particulars of the caseload protocol, see *State ex rel. Missouri Pub. Defender Comm'n v. Pratte*, 298 S.W.3d 870, 875–80 (Mo. banc 2009).

4. 18 CSR 10–4.010 originally was promulgated as an emergency rule that took effect December 28, 2007, and expired June 30, 2008.

The current, permanent rule took effect July 30, 2008. 18 CSR 10–4.010.

5. The geographic boundaries for the district offices are established by the commission, which conducts routine staffing reviews to allocate personnel to each district office as required by its caseload, pursuant to its caseload study and particular district needs.

When asked why public defenders are not moved among district offices once one office

At least one month prior to limiting a district office's availability, the director of the state public defender's office must notify a court's presiding or chief judge that the district office's maximum caseload limit has been exceeded and that the office is at risk of being placed on limited availability. 18 CSR 10-4.010(2)(B). The district defender and designated state public defender management personnel then are required by the rule to consult with the court and the state's attorney to discuss how best to address the district's excessive caseload.[6] *Id.* at 10-4.010(2)(C); *Pratte*, 298 S.W.3d at 887.

### C. Court's Appointment of Public Defender Office after Certification as Unavailable

In January 2010, the director of the state's public defender office notified 38th Circuit Presiding Judge Mark Orr that the public defender district office assigned to represent defendants in that circuit had exceeded the maximum caseload permitted under the caseload protocol for three consecutive months and, therefore, was at risk of being certified for limited availability.[7] Under the requirements of 18 CSR 10-4.010(2)(C), meetings were held in March 2010 that included Judge Orr, local prosecutors, and personnel from both the state and district public defender's office. When those meetings failed to produce any agreements for caseload reduction, general counsel for the state public defender's office contacted Judge Orr, Christian County Associate Circuit Judge John Waters and local prosecutors to request a second meeting in April 2010. Though the parties and judge met again in April 2010,[8] the master

reaches its maximum caseload capacity, counsel for the public defender system testified that there are no excess defenders, so "if we take lawyers out of one office we're reducing the capacity of that office and then they get in trouble" with excessive caseloads. He further explained that excessive caseloads are so systemic across district offices that shuffling attorneys among them would be akin to "simply rearranging deck chairs on the Titanic." As *Pratte* explained, "The problem that the commission confronts is that the resources provided for indigent defense are inadequate." 298 S.W.3d at 873.

6. In their entirety, the portions of 18 CSR 10-4.010(2) pertinent here state:
 (A) When the director determines that a district office has exceeded the maximum caseload standard for a period of three (3) consecutive calendar months, the director may limit the office's availability to accept additional cases by filing a certification of limited availability with the presiding judge of each circuit or chief judge of each appellate court affected.
 (B) The director shall provide notice to the presiding or chief judge of each affected court that an office is at risk of being certified at least one (1) calendar month prior to limiting the availability of a district office under this rule.

 (C) Upon the provision of such notice, the district defender and such other Missouri state public defender (MSPD) management personnel as the director shall designate shall consult with the court and state's attorney to discuss the categories of cases to be designated for exclusion from public defender representation once the district is certified by the director as of limited availability.
 18 CSR 10-4.010(2)(A-C). As explained more fully below, this Court held in *Pratte* that the public defender may not refuse appointments of categories of cases, but it may limit a particular district office's availability to hear *any* case. 298 S.W.3d at 884. Rather than issue an amended rule in light of *Pratte*, the commission supplemented the rule with a "Rule Action Notice," which states that *Pratte* voided those portions of the rule pertaining to the commission's authority to decline only certain categories of cases. 18 CSR 10-4.010.

7. The 38th Judicial Circuit is served by public defender district office 31, which represents defendants in Christian, Greene and Taney counties.

8. The record is not clear as to who was present at the April 2010 meeting. General counsel for the state public defender testified that

found that none offered any concessions or agreed to any of the others' proposals to avoid the impending certification of the office as on limited availability. As a result, these meetings failed to produce an agreement that would reduce the district's caseload. The director of the state public defender office, therefore, certified the district defender's office as on limited availability as of July 1, 2010.

After the district office was so certified, the state public defender's general counsel contacted Judge Orr to "propose a meeting to anticipate the impacts and to discuss the consequences and mechanics" of the office's limited availability. There is no evidence in the record that further meetings took place, however, until July 21, 2010, when the state public defender's general counsel met with Judge Orr to notify him that appointments for the month exceeded the district defender's maximum permissible caseload and, as permitted by 18 CSR 10–4.010(2)(A), the state public defender declared the district defender office as unavailable to accept additional cases until August 2010.[9]

On July 28, 2010, Jared Blacksher appeared for his initial arraignment before Judge Waters who, over objection, appointed "the public defender's office" to represent him.[10] On August 2, 2010, the state public defender's office filed a motion to set aside the appointment because it violated 18 CSR 10–4.010. In response, Judge Waters held an evidentiary hearing at which the public defender presented evidence it had exceeded its caseload capacity under 18 CSR 10–4.010. The prose-

cutor asked questions about how defenders were appointed and how overcapacity was determined. No one questioned that the district defender office, in fact, had exceeded its caseload capacity under the protocol, nor was there any claim that the rule was invalid or inapplicable.

Judge Waters gave thoughtful consideration to the issues raised by both parties. He expressed concern that if the public defender were not appointed, then Mr. Blacksher and others like him would have less ability to post bond and that private counsel might not have adequate expertise to represent defendants charged with serious felonies. Judge Waters remarked that it was a "horrible situation," and he was "not criticizing anybody," but that "judges are in the middle." He concluded by stating his belief that "under the law the Constitution and the Sixth Amendment I have no choice but to do what the law requires and appoint the Public Defender to represent Mr. Blacksher."

Mr. Blacksher subsequently was bound over for arraignment before Judge Orr, who did not rescind the order appointing the public defender. The public defender commission, the state director and the district director (collectively, "the public defenders") sought relief from this Court, which issued a preliminary writ in September 2010 prohibiting Judge Orr from taking further action in Mr. Blacksher's case, other than rescinding the order, until further order of this Court.

In October 2010, this Court appointed a special master to: (1) examine the accura-

the meeting was "pretty informal" and that "people would enter and leave" throughout the conference. At various points, it appears that both Judges Orr and Waters were present, along with local prosecutors and personnel from both the state and district defender office.

9. Beyond personally meeting with Judge Orr, the state public defender's office also notified him via e-mail on July 21, 2010, that district 31 had reached caseload capacity.

10. Mr. Blacksher had been charged with two counts of burglary and one count of forgery.

cy of the caseload standards protocol contained within 18 CSR 10–4.010; (2) determine whether the procedures set forth in that rule were followed; and (3) identify, if the rule was followed, why its procedures were inadequate to resolve the issue. The special master took extensive evidence concerning the basis for developing the protocol, whether the standards on which it partially was based remain accurate, how the commission had updated those standards through its own workload studies, how those studies were used to reach the caseload standards used in the protocol, whether the protocol was accurate and similar issues.[11] The special master found that the protocol was "not inaccurate" and that the procedures of the rule at least nominally were followed in this case but that those procedures, nevertheless, failed to resolve the issues presented here "because there was no voluntary agreement by the parties to find solutions."

In January 2011, Respondents petitioned this Court for a modification of the Court's preliminary order of September 2010 to allow Mr. Blacksher to plead guilty and be sentenced, should he wish to do so. In February 2011, this Court granted Respondent's motion to modify the preliminary writ, and Mr. Blacksher subsequently pleaded guilty.[12]

### D. Standard for Reviewing Failure to Follow Agency Rule

As a rule promulgated by an administrative agency, 18 CSR 10–4.010 and the caseload standards protocol within it are entitled to a presumption of validity and may "not be overruled except for weighty reasons." *Foremost–McKesson, Inc.*, 488 S.W.2d at 197; *cf. Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (federal courts must give "substantial deference to an agency's interpretation of its own regulations"). Rules and regulations are valid " 'unless unreasonable and plainly inconsistent' with the statute under which the regulation was promulgated." *Linton v. Missouri Veterinary Med. Bd.*, 988 S.W.2d 513, 517 (Mo. banc 1999), *quoting Foremost–McKesson, Inc.*, 488 S.W.2d at 197. "Administrative rules should be reviewed in light of the evil they seek to cure and are not unreasonable merely because they are burdensome." *Foremost–McKesson, Inc.*, 488 S.W.2d at 197–98. Moreover, where there is an allegation that a rule conflicts with a statute, review of that issue is governed by the principle that statutes must be read by this Court with the presumption that the General Assem-

**11.** Among other things, this evidence demonstrated that the commission's protocol is based on caseload standards established in the early 1970s by the National Advisory Council ("NAC") of the United States Department of Justice Task Force on the Courts. Though these standards have apparently served as the basis for many caseload standards currently in place across the nation, Respondents allege that the NAC standards are unreliable because they are not empirically based and because they do not capture properly the time required to represent defendants effectively in the various types of cases assigned to the public defender's office. In view of these criticisms, the commission presented its own evidence that the NAC standards were only the starting point in creating

the protocol and that the commission refined those standards after conducting an empirical workload survey of its own attorneys. Moreover, unlike the NAC standards, the public defenders argue that the protocol does account for the various types of cases assigned to the public defender's office.

**12.** Pursuant to a plea agreement, Mr. Blacksher pleaded guilty to one count of forgery and one count of burglary. He was sentenced to five years imprisonment for each count, with the sentences to run concurrently, though execution of the sentences was suspended. The remaining burglary count was dismissed.

bly "did not intend to violate the Constitution." *State ex rel. Anderson v. Becker,* 326 Mo. 1193, 34 S.W.2d 27, 29 (1930).

■■■ "The burden is upon those challenging the rule[ ] to show that [it] bear[s] no reasonable relationship to the legislative objective." *Foremost–McKesson, Inc.,* 488 S.W.2d at 197. In the absence of such a showing, a rule must be followed until properly and successfully challenged. *See id.* The usual mechanism by which to challenge the validity or application of an administrative agency's rule is a suit for declaratory judgment. § 536.050.1 ("The power of the courts of this state to render declaratory judgments shall extend to declaratory judgments respecting the validity of rules, or of threatened application thereof ...."); *accord* Rule 87.02(c). Where, as in *Pratte,* 298 S.W.3d at 882, and here, a court directs an agency to undertake conduct that it believes would violate its rule, a petition for writ is an appropriate mechanism for obtaining relief.

■■■ "The extraordinary remedy of a writ of prohibition is available: (1) to prevent the usurpation of judicial power when the trial court lacks authority or jurisdiction; (2) to remedy an excess of authority, jurisdiction or abuse of discretion where the lower court lacks the power to act as intended; or (3) where a party may suffer irreparable harm if relief is not granted." *Pratte,* 298 S.W.3d at 880. "When a trial court exceeds its authority in appointing the public defender, a writ of prohibition should issue to prohibit or rescind the trial court's order." *Id.* at 881. "Whether a trial court has exceeded its authority is a question of law, which an appellate court reviews independently of the trial court." *Id.* This Court also has "general superintending control" and "[s]upervisory authority" over the courts of this state. Mo. Const. art. V, § 4.1.

## II. ISSUES ARE NOT MOOT

■■■ Respondents argue that the commission's petition is moot because Mr. Blacksher's case was resolved by a guilty plea while this matter was pending. This same argument was raised in *Pratte* as to one of the three cases consolidated in that appeal. As *Pratte* noted in rejecting that argument, the issue now before the Court is one for which the public interest exception to the mootness doctrine finds particular resonance. 298 S.W.3d at 885 n. 33.

■■■ "The public interest exception to mootness applies whenever a case presents an issue that (1) is of general public interest and importance, (2) will recur and (3) will evade appellate review in future live controversies." *Gurley v. Missouri Bd. of Private Investigator Examiners,* 361 S.W.3d 406 (Mo. banc 2012). As *Pratte* explained, this exception permits a court to decide an issue "[e]ven though [it] may appear to be moot ... if 'there is some legal principle at stake not previously ruled as to which a judicial declaration can and should be made for future guidance.'" 298 S.W.3d at 885 n. 33, *quoting State ex rel. City of Joplin v. Pub. Serv. Comm'n,* 186 S.W.3d 290, 295 (Mo.App.2005).

The issue presented here, no less than the one presented in *Pratte,* "is one of general public interest and importance, is capable of repetition and may evade review if not decided in this proceeding." *Id.* As with the question at issue in *Pratte,* "The trial courts, the state and the public defender have an interest in this Court determining whether" the public defender's office may be appointed "to represent indigent defendants when the office is certified as being 'unavailable.'" *Id.* Moreover, as the commission points out, any case can be mooted simply by reaching a plea agreement with the defendant, as oc-

curred here, and to delay artificially a defendant's right to plead just so a case could be heard to conclusion in the appellate court would raise other serious concerns. Indeed, should the defendant prevail at the criminal trial, then no appeal would be permitted; and should the State prevail, then the public defender protocol would not be relevant during the defendant's appeal unless the trial court refused to appoint counsel or counsel was incompetent, and, even then, it would be relevant only to the extent it affected representation. A criminal appeal simply does not provide a mechanism for review of the caseload protocol, and the issue in any post-conviction proceeding centers on whether the defendant received a fair trial, not on the broader Sixth Amendment right to counsel that is at issue when considering whether counsel was appointed for all critical stages of the proceeding. *Missouri v. Frye*, 566 U.S. ——, ——, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012).

Further, regardless of the outcome or pendency of the criminal trial, to the extent that a trial court's order to represent a defendant is disobeyed, a district public defender or the state public defender also risks being sanctioned or held in contempt for its prior refusal to obey a court order. *See State ex rel. Girard v. Percich*, 557 S.W.2d 25, 37–38 (Mo.App.1977) (explaining "[o]nce a court . . . issues an order . . . the order must be scrupulously obeyed even though it may prove to be erroneous" and that until the "decision is modified or reversed it must be respected under pain of contempt"); *Teefey v. Teefey*, 533 S.W.2d 563, 566 (Mo. banc 1976), *quoting Mechanic v. Gruensfelder*, 461 S.W.2d 298, 305–06 (Mo.App.1970) (noting that criminal contempt citations serve "the purpose of protecting the dignity of the court and, more important, [protecting] the authority of its decrees" and that, without the power to issue such citations, "courts are no more

than advisory bodies to be heeded or not at the whim of the individual").

The case of *State ex rel. Picerno v. Mauer*, 920 S.W.2d 904 (Mo.App.1996), is instructive on this point. There, an attorney appointed to represent an indigent defendant renewed on the day of trial a previously denied request for a continuance because, he argued, he had not had adequate time to prepare for trial, due in part to his excessive caseload. *Id.* at 906. As such, the attorney argued that "the defendant would not get a fair trial, due process or adequate representation without a continuance." *Id.* The trial court again denied the continuance and ordered counsel to stay in the court and proceed with the trial. *Id.* When the attorney instead left the courtroom, the trial court held him in criminal contempt for violating the court's order to remain in the court. *Id.* at 905. The attorney subsequently petitioned for a writ prohibiting enforcement of the court's contempt order. *Id.* In addressing that petition, the court explained that, while it "sympathize[d] with public defenders for the workload they must undertake," the attorney's refusal to obey the court's order constituted contempt because " '[a]ny attack on the propriety of the order must be by judicial process and not willful disobedience.' " *Id.* at 911, *quoting Percich*, 557 S.W.2d at 38.

While, in light of the filing of this writ, it is unlikely that a contempt charge or sanctions would be imposed, public defenders should not be put at risk of having these punishments levied each time they are placed in the position of choosing to obey the court or to obey a rule that was promulgated to ensure that defenders may comply with their ethical obligations and the Sixth Amendment. An order directing the trial court to vacate its order appointing the public defender is not moot, therefore, as a writ of prohibition is appropriate

to "'to restrain further enforcement of orders that are beyond or in excess of a [court's] authority....'" *Pratte*, 298 S.W.3d at 880, *quoting State ex rel. Robinson v. Franklin*, 48 S.W.3d 64, 67 (Mo. App.2001).

### III. SIXTH AMENDMENT RE-QUIRES COMPETENT REPRE-SENTATION

#### A. Balancing Statutory Duty to Provide Defense with Sixth Amendment Right to Effective Counsel

The key issue in dispute here and below is whether the duty of public defenders to provide a defense to indigent criminal defendants as set out in section 600.042.4 requires them to accept a judge's appointment to act as counsel no matter the size of their existing caseload and their ability to provide effective representation to their existing or any additional clients and despite the mechanisms contained in 18 CSR 10–4.010.

Respondents acknowledge that section 600.017(10), as explained above, authorizes the commission to promulgate rules to administer the state's public defender system. But, Respondents argue, to the degree 18 CSR 10–4.010 permits the public defender to refuse to represent eligible defendants, the rule conflicts with the statutory mandate in section 600.042.4 that "[t]he director and defenders shall provide legal services to an eligible person."

Because "rules may not conflict with statutes," *Pratte*, 298 S.W.3d at 882, Respondents argue, 18 CSR 10–4.010 must be disregarded, and, as judges, they are required to appoint the public defender regardless of a district office's unavailability. Moreover, Respondents say, the Sixth Amendment right to counsel is best effectuated by appointing public defenders, not by failing to do so.

The public defender argues that the duty to represent indigent defendants can and must be balanced with the obligation of an attorney to provide *competent and effective* assistance in order to meet an attorney's ethical and constitutional obligations. This position finds strong support in the fact that, just as regulations must be read in light of the statutes they implement, statutes must be read with the presumption that the General Assembly "did not intend to violate the Constitution." *Becker*, 34 S.W.2d at 29.

██ Of particular relevance here is the Sixth Amendment. It provides in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Because this right is "fundamental and essential to a fair trial," the constitutional guarantee of counsel is "protected against state invasion by the Due Process Clause of the Fourteenth Amendment." *Gideon v. Wainwright*, 372 U.S. 335, 341, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). To that end, Missouri's Constitution similarly provides, "in criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel." Mo. Const. art. I, § 18(a).

██ As fully amplified, these provisions guarantee that, "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial." *Argersinger v. Hamlin*, 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). "This means, in practical effect, that an indigent accused ... cannot be prosecuted, convicted, and incarcerated in Missouri unless he is furnished counsel." *State v. Green*, 470 S.W.2d 571, 572 (Mo. banc 1971).

To fulfill *Gideon's* promise that "every defendant stands equal before the law," 372 U.S. at 344, 83 S.Ct. 792, the Missouri General Assembly has enacted an elaborate public defender system to provide legal services to indigent defendants. *See* §§ 600.011–600.101. Section 600.042.4 provides that the director of the state's public defender system, as well as the defenders[13] within it, "shall provide legal services to an eligible person."[14] Rule 31.02(a) also reflects this principle by stating:

> If any person charged with an offense, the conviction of which would probably result in confinement, shall be without counsel upon his first appearance before a judge, it shall be the duty of the court to advise him of his right to counsel, and of the willingness of the court to appoint counsel to represent him if he is unable to employ counsel.

The rule further specifies that, "[u]pon a showing of indigency, it shall be the duty of the court to appoint counsel to represent" a person charged with an offense likely to result in imprisonment. Rule 31.02(a).

 "That a person who happens to be a lawyer is present at trial alongside the accused, however, is *not enough to* satisfy the constitutional command." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Neither judges nor public defenders satis-

fy "[t]he Constitution's guarantee of assistance to counsel ... by mere formal appointment." *Avery v. Alabama*, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940). Rather, "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685, 104 S.Ct. 2052. "In other words, the right to counsel is the right to *effective* assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 377, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (emphasis added).

This Court has reiterated these principles on numerous occasions. Most recently, in *Pratte*, this Court affirmed that, notwithstanding "that the resources provided for indigent defense are inadequate," a judge nevertheless has the duty to "ensure that the defendant has *effective* assistance of counsel." 298 S.W.3d at 873, 875 (emphasis in original).[15]

 Moreover, this right is affirmative and prospective. "It is well settled that the right to the effective assistance of counsel applies to certain steps before trial, [as the] 'Sixth Amendment guarantees a defendant the right to have counsel present at all *critical stages of the criminal* proceedings.'" *Frye*, 566 U.S. at ——, 132 S.Ct. 1399 (2012), *quoting Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).[16] "Critical stages

---

**13.** "Defenders" includes those who "serve as staff attorneys in the state defender system and assigned counsel who provide defense services on a case basis." § 600.011(4).

**14.** An "eligible person" is an individual "who falls within the financial rules for legal representation at public expense." § 600.011(6).

**15.** *See also Taylor v. State*, 262 S.W.3d 231, 249 (Mo. banc 2008) ("The Sixth Amendment affords all citizens facing criminal charges the right to effective assistance of counsel."); *State ex rel. Wolfrum v. Wiesman*, 225 S.W.3d

409, 412 (Mo. banc 2007) ("Any defendant [who] has exercised his right to counsel is guaranteed effective assistance of counsel, and courts should do the utmost to protect the defendant's right to adequate and competent representation."); *Sanders v. State*, 738 S.W.2d 856, 856 (Mo. banc 1987) ("The Sixth Amendment guarantees the right to effective assistance of counsel.").

**16.** *See also Iowa v. Tovar*, 541 U.S. 77, 80, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004) ("The Sixth Amendment safeguards ... the right to

include arraignments, postindictment interrogations, postindictment lineups, ... the entry of a guilty plea," as well as trial. *Id.; see also United States v. Lewis,* 483 F.3d 871, 874 (8th Cir.2007) (same).

This principle explains why the dissent is incorrect in stating that the Court's analysis here conflicts with *Cooper v. State,* 356 S.W.3d 148 (Mo. banc 2011), and *Krupp v. State,* 356 S.W.3d 142 (Mo. banc 2012). *Cooper* and *Krupp* concerned whether a judgment should be set aside and a new trial ordered due to ineffective assistance of counsel—an issue analyzed under *Strickland.* In those cases, this Court found that, under *Strickland,* a potential conflict of interest is insufficient to support a new trial in the absence of a showing of an actual conflict or prejudice.

By contrast, the issues here are a defendant's Sixth Amendment right to counsel at all critical stages of the proceeding and counsel's ethical obligation not to accept work that counsel does not believe he or she can perform competently. In other words, unlike *Cooper* and *Krupp,* the issues here do not concern whether to set aside a final judgment of conviction.

■■■ No case suggests that a court analyze whether the Sixth Amendment right to counsel has been preserved at all critical stages only by retrospectively determining that the lack of such counsel deprived a defendant of a fair trial. To the contrary, as set out in detail above, the United States Supreme Court has explained that "[i]t is well settled" that the Sixth Amendment right to counsel is broader than the question of whether a court must retrospectively set aside a judgment due to ineffective assistance of counsel. The constitutional right to effective counsel applies to all critical stages of the proceeding; it is a prospective right to have counsel's advice

counsel at all critical stages of the criminal

during the proceeding and is not merely a retrospective right to have a verdict or plea set aside if one can prove that the absence of competent counsel affected the proceeding. *Frye,* 566 U.S. at ——, 132 S.Ct. 1399 (2012); *Iowa v. Tovar,* 541 U.S. 77, 80, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004).

■■■ Simply put, a judge may not appoint counsel when the judge is aware that, for whatever reason, counsel is unable to provide effective representation to a defendant. Effective, not just pro forma, representation is required by the Missouri and federal constitutions.

## B. Ethical Duty of Counsel to Provide Effective Representation

This Court's rules of professional conduct also impose on all counsel an "ethical duty to provide effective assistance of counsel to [their] clients." *Pratte,* 298 S.W.3d at 890; *see also* Rules 4–1.1, 4–1.3, 4–1.4. Counsel violates these rules if she accepts a case that results in a caseload so high that it impairs her ability to provide competent representation, to act with reasonable diligence and to keep the client reasonably informed. *See* Rules 4–1.1, 4–1.3 and 4–1.4.

■■■ Further, these duties apply not just in relation to new clients, but also to existing clients, so that an attorney's acceptance of a new case violates Rule 4–1.7 if it compromises her ability to continue to provide effective assistance to her other clients. In relevant part, Rule 4–1.7 provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." Rule 4–

process.").

1.7(a)(2). As noted in *In re Edward S.*, 173 Cal.App.4th 387, 92 Cal.Rptr.3d 725, 746–47 (2009), "a conflict of interest is inevitably created when a public defender is compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing."

No exception exists to the ethics rules for lawyers who represent indigent persons. To the contrary, as the American Bar Association has aptly noted, there is an "implicit premise that governments, which establish and fund providers of public defense, never intended that the lawyers who furnish the representation would be asked to do so if it meant violating their ethical duties pursuant to professional conduct rules." *Am. Bar Ass'n, Eight Guidelines of Public Defense Related to Excessive Workloads, August 2009, at 11*. For this reason, "public defenders are risking their own professional lives" when appointed to an excessive number of cases. *Pratte*, 298 S.W.3d at 880.

■■■ And while the ethical rules do not supplant "a trial judge's obligation to protect [a] defendant's Sixth Amendment rights," they do "run[ ] parallel to" that duty and, therefore, can assist both judges and public defenders in ensuring that constitutional rights are protected when appointments are made. *State ex rel. Kinder v. McShane*, 87 S.W.3d 256, 265 (Mo. banc 2002); *see also Frye*, 566 U.S. at ——, 132 S.Ct. 1399 (2012) ("Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides.").

Therefore, as *Pratte* noted, section 600.042.4's mandate that "[t]he director and defenders shall provide legal services to an eligible person" must be read to require representation that *does* satisfy the constitution's guarantee. This means,

*Pratte* held, that appointed counsel must be in a position to provide *effective* assistance. 298 S.W.3d at 875.

## C. Commission Authority to Adopt Caseload Standards Protocol

It was with these rights and obligations of defendants and of counsel in mind that the commission, pursuant to the authority vested in it by section 600.017(10), enacted 18 CSR 10–4.010. As noted above, the express purpose of the rule is to ensure that public defenders can represent defendants in a manner consistent with their constitutional and statutory obligations. 18 CSR 10–4.010. The caseload standards protocol contained within 18 CSR 10–4.010 was designed to aid in the realization of section 600.042.4's mandate by assisting public defenders, prosecutors and judges in fulfilling their duties to ensure that effective representation is not compromised by excessive appointments.

Respondents say that it would be far better for the system as a whole and for defendants in particular if the commission simply managed the public defender caseload better, such as by better assigning public defenders and by only assigning the most complex cases to them. They also express doubt that the public defender district offices really are as overburdened as the protocol suggests or that public defenders are more overworked than prosecutors, judges or other participants in the criminal justice system. And implicit in their criticisms is the practical problem presented by the fact that, while a valid rule issued by the public defender commission can govern the conduct of public defenders, it cannot bind the actions of judges or prosecutors, for the commission has no authority over judges or prosecutors.

To the extent that Respondents' criticisms express their honest disagreement

with the philosophy behind the caseload standards protocol or with these practical problems with its implementation, however, they are best directed toward trying to convince the commission or the legislature to adopt a different approach. Unless or until that occurs, though, such disagreement with the wisdom of an agency's rules has no effect on the agency's authority to promulgate them in the first instance. And, unless such an agency rule is invalidated in whole or in relevant part, it directs the actions of the public defenders, as occurred here.

A prime example of how partial invalidation of a rule might occur is provided by *Pratte*. *Pratte* arose after the commission attempted, in an effort to limit caseloads, to institute a practice whereby district offices on limited availability would not represent otherwise eligible defendants who were before the court in probation revocation cases in which a suspended execution of sentence had been imposed or who had, at any point during the pendency of their cases, retained private counsel. 298 S.W.3d at 882, 883. *Pratte* held that such wholesale refusal to represent categories of persons otherwise eligible for public defender services directly conflicts with other statutory provisions in chapter 600 that require representation by the public defender.[17] *Id.* at 883, 885.

*Pratte* did not, however, question the commission's authority to issue rules governing the management of caseloads in its offices, nor did it reach the issue of whether the protocol that the commission adopted, and the numbers on which it is based, are otherwise accurate and valid. The latter issues were not presented in that case.

■ They likewise are not presented here. Instead, because Respondents did not agree that the Sixth Amendment right to effective counsel and this Court's ethical rules must be read consistently with the statute governing appointment of public defenders, Judge Waters believed it was his Sixth Amendment obligation to disregard the rule and appoint the public defender's office regardless of whether it had exceeded its caseload capacity. This Court holds and reaffirms that the Sixth Amendment and this Court's ethics rules require that a court consider the issue of counsel's competency, and that counsel consider whether accepting an appointment will cause counsel to violate the Sixth Amendment and ethical rules, before determining whether to accept or challenge an appointment.

While, in the course of the hearing on this issue, Judge Waters took some evidence on the development of the protocol and its accuracy, ultimately he did not determine its accuracy in his ruling nor did he address whether the facts necessary for its invocation were present here.

At this Court's direction, after the commission sought a writ of prohibition, a special master was appointed to take evidence regarding the accuracy of the protocol, whether it was followed here and why it allegedly was not effective. The special master undertook extensive hearings regarding these issues, but beyond finding

---

17. In particular, *Pratte* held that the commission's approach conflicted with the mandate in section 600.042(4)(3) that the public defender "shall provide legal services to an eligible person ... charged with a violation of probation," and with the requirement of section 600.086 that, regardless of whether a defendant had previously obtained private counsel, "[a] person shall be considered eligible for representation [by the public defender] ... when it appears from all the circumstances of the case ... that the person does not have the means at his disposal or available to him to obtain counsel in his behalf and is indigent." *See* 298 S.W.3d at 883, 885.

that the protocol is "not inaccurate," both he and the parties treated the case as a public policy issue rather than as a fundamental challenge to the validity and application of an agency rule, and it is not clear what standards the special master applied in so doing. The proceedings before the special master were part of the writ proceeding in this Court. They could not and did not function as a declaratory judgment; they were not adversarial in a traditional sense, nor was there a full evidentiary hearing held to determine the validity of 18 CSR 10–4.010 by cross-examination. Resolution of these issues, therefore, is left open for another day.

The special master did find specifically that the protocol adopted pursuant to 18 CSR 10–4.010 is "not inaccurate." He also made findings as to why, on the specific record before him, the rule did not provide an effective mechanism to deal with the caseload crisis in Respondents' circuit. In particular, he found that the provision for holding meetings to develop solutions to the excessive caseload and avoiding certification of the district as on limited availability was unsuccessful because "there was no voluntary agreement by the parties to find solutions."

The special master further said he believed this lack of success resulted from the fact that the rule alone "cannot compel [the] stakeholders to agree to anything," that "[j]udges do not have to agree to expedited case management or appointment of counsel," and that "[p]rosecutors do not have to agree to file fewer cases, ask for less jail time, or initiate diversion programs."

The special master's report also stated that "[j]udges and prosecutors do not carry all the blame," as the rule also fails to "require any concessions from the [public defender]." The special master's report concluded by explaining that the meetings required by 18 CSR 10–4.010(2)(C) failed in this case because there was no agreement made by the parties "to do anything differently," "[t]here was no requirement from any higher authority that they should even try" and "[t]here was no particular incentive for them to do so."

Further, Respondents suggested such meetings are not necessary, as the best solution to the case overload problem is for the public defender simply to decline those cases that do not raise particularly complex or serious criminal matters and, in that way, conserve its resources for when they are needed most. Of course, Respondents' suggestion fails to take into account that the public defender attempted that approach in its initial version of 18 CSR 10–4.010 and that this Court specifically held in *Pratte* that the public defender has no authority to accept or reject categories of cases based on their seriousness.

This Court's holding in *Pratte* was based solely on the public defender's lack of legal authority to implement such a solution, however, and did not address the merits of the rationale for 18 CSR 10–4.010(2)(C)'s directive that public defenders meet with the court and prosecutors to determine categories of cases in which representation by public defenders is not mandated constitutionally or in which the lack of such representation would have less egregious consequences.

In fact, the master's findings and Respondents' arguments suggest that the public defender's proposed solution, invalidated in *Pratte*, may be the most workable solution to the caseload issue, at least until such time as the public defender office is funded adequately.

 While the public defender lacked the authority to implement such a solution, trial courts have both the authority and the responsibility to manage their dockets

in a way that both moves their cases and respects the constitutional, statutory and ethical rights and obligations of the defendant, the prosecutor, the public defender and the public. In this regard, the trial judge has authority over the public defender's caseload that the public defender itself does not. For, unlike a public defender office, a trial court has the authority to grant a motion filed by a public defender to be relieved, at least for some period of time, from being required to provide representation in less serious cases because the lack of resources will not allow the public defender simultaneously to provide competent representation in more serious cases.

More broadly, as set out in the introductory portion of this opinion, a trial court can use its inherent authority over its docket to "triage" cases so that those alleging the most serious offenses, those in which defendants are unable to seek or obtain bail, and those that for other reasons need to be given priority in their resolution *are* given priority in appointing the public defender and scheduling trials, even if it means that other categories of cases are continued or delayed, either formally or effectively, as a result of the failure to appoint counsel for those unable to afford private counsel.

If the judge, prosecutor, public defender and, where appropriate, the local bar associations work together using this procedure and other creative mechanisms both in individual cases and proactively to avoid reaching the caseload maximums set out in the commission's protocol, jurisdictions may be able to avoid the need in the first instance for the public defender to certify an office as unavailable as permitted by 18 CSR 10–4.010(2)(A).

The trial court should hold meetings in which the stakeholders undertake a good-faith effort to develop strategies that will avoid the need to invoke the protocol or that will alleviate the need to continue operating under the protocol when it already has been invoked.

Because there may be challenges regarding the actions taken by the trial court if no agreement is reached between the public defender and prosecutor, and because a criminal defendant who is denied appointment of a public defender under any agreement similarly may challenge the court's actions, such meetings should be held on the record. At these proceedings, the court and parties should consider those mechanisms identified in *Pratte* and in this opinion as well as any additional creative mechanisms that may be appropriate in the court's particular circuit to avoid the certification of a public defender office as having limited availability.[18]

It also may be necessary to hold evidentiary hearings on the record in individual cases to allow review of the factual basis

---

18. Among the issues that could be discussed are whether agreements can be reached that jail time will not be sought for certain cases or types of cases; the broader use of signature bonds and the consideration of lower bail amounts for those charged with nonviolent crimes that otherwise might be subject to diversion or be resolved without jail time; whether to appoint counsel in certain categories of cases until the caseload of a district office is within manageable limits; whether a delay in prosecution or lengthy continuances should be granted in less serious cases even after appointment of counsel; whether to appoint private counsel rather than the public defender when a case does not involve a serious felony or other complex matter; or such other creative solutions as may be worked out in a particular circuit. The program implemented by the Springfield Metropolitan Bar Association, in which private counsel volunteered to represent individuals charged with less serious crimes, was a stellar example of creative problem-solving by the bench and the bar.

for the trial court's action, including whether the rule was invoked properly in a particular case or public defender district.

Use of these mechanisms to avoid burdening public defenders with more clients than they constitutionally can represent is not without its potential costs. First, some of these mechanisms may result in delayed prosecution of cases. This in turn may cause a delay in the imposition of punishment on those later found guilty, a delay in providing justice for those who are victims of crime and a delay in acquittal for those who ultimately are found not guilty. It also may result in the release of some offenders because of a violation of their rights to a speedy trial under the United States and Missouri constitutions. U.S. Const. amend. VI; Mo. Const. art. I, § 18(a); *see also State ex rel. McKee v. Riley*, 240 S.W.3d 720 (Mo. banc 2007). But the risk of such consequences cannot justify the denial of the defendants' Sixth Amendment right to counsel, nor can it justify requiring public defenders to undertake representation in violation of their ethical obligations.[19]

Here, because the trial court did not find the regulation invalid or inapplicable, it erred in ordering the public defender to disobey it.

## IV. CONCLUSION

For the reasons set forth above, this Court holds that the trial court exceeded its authority by appointing the public defender's office to represent a defendant in contravention of 18 CSR 10–4.010. That rule was promulgated by the commission pursuant to authority vested in it by the legislature, and there has been no showing that the rule is invalid or was applied improperly. Unless such a showing can be

made, the public defender was required to comply with the rule.

Given the consequences that flow from its application, however, it is incumbent on judges, prosecutors and public defenders to work cooperatively to develop solutions, in meetings captured on the record, to avoid the scenario that occurred here. Trial courts understandably have been hesitant to undertake such an active management role in the absence of guidance and direction from this Court emphasizing their authority to do so.

This Court, therefore, makes clear that trial judges have the responsibility to use their inherent authority to manage their dockets to take an active and productive role in the effort to avoid or limit the need to certify a public defender office as having limited availability.

This Court's preliminary writ is made permanent as modified to the extent of ordering the trial court to vacate its order appointing the public defender to represent Mr. Blacksher.

TEITELMAN, C.J., BRECKENRIDGE and DRAPER, JJ., concur.

FISCHER, J., dissents in separate opinion filed.

RUSSELL and PRICE, JJ., concur in opinion of FISCHER, J.

ZEL M. FISCHER, Judge.

This matter arises from the Missouri Public Defender Commission ("the Commission") petitioning this Court for a writ of prohibition ordering the 38th circuit court to withdraw its appointment of the public defender's office of District 31 ("District 31") to represent Jared Blacksh-

---

19. This Court may be required to modify time standards in acknowledgement of the delays necessitated by the insufficient public defender resources.

er because, in so doing, the court violated 18 CSR 10–4.010.

I respectfully dissent from the majority opinion because I believe the issues presented by the writ petition in this case are moot; therefore, the preliminary writ of prohibition issued by this Court should be quashed. I also write separately to recognize that the majority opinion's analysis of whether counsel was ineffective in this case is in conflict with this Court's recent decisions in *Cooper v. State*, 356 S.W.3d 148 (Mo. banc 2011), *and Krupp v. State*, 356 S.W.3d 142 (Mo. banc 2011).

## FACTS

In January 2010, Judge Mark Orr, the presiding judge of the 38th circuit, was notified by the director of the public defender office ("the Director"), pursuant to 18 CSR 10–4.010(2)(A), that District 31 had exceeded the maximum caseload protocol for three consecutive months and, therefore, was at risk of being certified for limited availability. In response, Judge Orr, local prosecutors, and representatives from the public defender's office followed the procedures of 18 CSR 10–4.010(2),[1] met together in both March and April 2010 to attempt to formulate a solution to this problem, but were ultimately unsuccessful. As a result, the caseload of District 31 did not decline, and the Director certified that District 31 would begin limiting its availability for appointed cases starting July 1, 2010.

On July 28, 2010, Blacksher appeared for a preliminary hearing on three felony cases in the associate circuit division. Despite District 31's announcement that it was no longer accepting appointments for the rest of July, Judge John Waters, who was presiding over the cases, appointed District 31 to represent Blacksher over its

objection. District 31 subsequently filed a motion to set aside the appointment, which was overruled, and on that same day, with the benefit of his public defender, Blacksher waived his right to a preliminary hearing and was bound over for further proceedings in the circuit division presided over by Judge Orr.

In September 2010, the Commission sought a petition for a writ of prohibition with this Court. A day later, this Court issued a preliminary writ prohibiting Judge Orr, the judge presiding over Blacksher's cases, from taking further action in those cases other than to rescind the order appointing District 31 to represent Blacksher, until further order by this Court. In February 2011, on request by the State, this Court modified its preliminary order to allow Blacksher to plead guilty and to be sentenced in two of the felony cases underlying this action and to allow the third case to be dismissed. Shortly thereafter, Blacksher appeared before the court in person and through his counsel, a public defender from District 31. Blacksher pleaded guilty to one count of forgery and one count of burglary; one other count of burglary was dismissed. He was sentenced to five years on each count to run concurrently, and execution of that sentence was suspended.

## STANDARD OF REVIEW

The extraordinary remedy of a writ of prohibition is available: (1) to prevent the usurpation of judicial power when the trial court lacks authority or jurisdiction; (2) to remedy an excess of authority, jurisdiction or abuse of discretion where the lower court lacks the power to act as intended; or (3) where a party may suffer irreparable harm if relief is not granted.

---

1. As determined in the report of the special master appointed by this Court.

Prohibition may be used to undo acts done in excess of a court's authority *as long as some part of the court's duties in the matter remain to be performed* and may be used to restrain further enforcement of orders that are beyond or in excess of a court's authority. Whether a trial court has exceeded its authority is a question of law, which an appellate court reviews independently of the trial court. When a trial court exceeds its authority in appointing the public defender, a writ of prohibition should issue to prohibit or rescind the trial court's order.

*State ex rel. Mo. Pub. Defender Comm'n v. Pratte,* 298 S.W.3d 870, 880–81 (Mo. banc 2009) (internal quotations omitted) (emphasis added).

## ANALYSIS

A threshold question in this matter is the mootness of the controversy. *State ex rel. Reed v. Reardon,* 41 S.W.3d 470, 473 (Mo. banc 2001); *State ex rel. Chastain v. City of Kansas City,* 968 S.W.2d 232, 237 (Mo.App.1998) (applying the doctrine of mootness in a writ context).

With regard to justiciability, a case is moot if a judgment rendered has no practical effect upon an existent controversy. Because mootness implicates the justiciability of a case, the court may dismiss a case for mootness *sua sponte.* When an event occurs that makes a decision on appeal unnecessary or makes it impossible for the appellate court to grant effectual relief, the appeal is moot and generally should be dismissed.

*Chastain,* 968 S.W.2d at 237 (internal quotations omitted); *see also Reed,* 41 S.W.3d at 473.

At the outset, it was my view in February 2011 at the time this Court allowed Blacksher to enter his guilty pleas with the benefit of appointed counsel from District 31, and it remains my view, that no further duties were owed under the order of appointment of counsel and that the writ should have been quashed. In February 2011, all of the cases underlying this proceeding in which a public defender from District 31 was appointed to represent Blacksher were resolved. At that time, any actual or vital controversy in those cases susceptible to relief was resolved. For a writ of prohibition to issue, some of the duties of the circuit court must remain to be performed. *Pratte,* 298 S.W.3d at 880–81. The circuit court's judgments accepting Blacksher's pleas of guilty became final when it sentenced him. *Stevens v. State,* 208 S.W.3d 893, 894 (Mo. banc 2006). At that time, there were no duties left for the circuit court to perform, and all the issues presented by the Commission's petition for a writ of prohibition became moot.

The majority opinion appears to recognize that the issues presented by Blacksher's cases are now moot by stating that "during the course of this appeal [his] case was resolved by a guilty plea;" therefore, the majority opinion only orders the circuit court to "vacate its order appointing the public defender to represent [Blacksher]." Op. at 598. This proceeding involves the request for an extraordinary writ, not an appeal. The continuation of the preliminary writ did not have any practical effect on Blacksher's cases; in fact, this Court's mandate vacating the order appointing the public defender is meaningless. None of the relief sought by the Commission's petition for writ of prohibition would now have any practical effect on Blacksher's cases or any future case; therefore, the petition is moot. *Reed,* 41 S.W.3d at 473. The majority seeks to overcome this obstacle by forcing the issues in this proceeding to fit within the "public interest" exception set forth in *Gurley v. Mo. Bd. of Private*

*Investigator Exam'rs,* 361 S.W.3d 406 (Mo. banc 2012). Op. at 603–04. In my view, this Court should not exercise its discretion to issue an extraordinary writ in this case or, for that matter, any case in which it will have no practical effect. The majority opinion specifically states it does not determine the validity of 18 CSR 10–4.010, op. at 611–12, so the opinion does not have any effect on any future case.

In *Gurley,* this Court recognized the "public interest" exception to the doctrine of mootness. 361 S.W.3d at 414. The exception applies "whenever a case presents an issue that (1) is of general public interest and importance, (2) will recur and (3) will evade appellate review in future live controversies." *Id. Gurley,* however, also indicates that if all three of these criteria are not met, the exception does not apply and this Court does not have discretion to entertain the arguments rendered moot. *Id.*

While I agree that the issues presented in Blacksher's cases meet two of these three criteria, this is simply not enough for the "public interest" exception to apply. The majority opinion states that the issues presented will evade review because,

> should the defendant prevail at the criminal trial, then no appeal would be permitted; and should the State prevail, then the public defender protocol would not be relevant on the defendant's appeal unless the trial court refused to appoint counsel or counsel was incompetent, and even then, it would be relevant only to the extent it affected representation.

Op. at 604. The majority opinion then concludes that "[a] criminal appeal simply

does not provide a mechanism for review of the caseload protocol." *Id.*

The majority opinion seemingly rests on its conclusion that a criminal appeal "does not provide a mechanism for review of the caseload protocol;" however, this does not mean that the case protocol will avoid review. Issues similar to the ones presented here have not previously evaded review. Instead, issues concerning the case load protocol were litigated in a writ proceeding that was not moot. In *Pratte,* the very opinion that the majority relies on for asserting that the issues in this case will evade review, the appointment of public defenders to represent two of the three defendants in contravention of CSR 10–4.010 did not evade review by this Court. 298 S.W.3d at 881–85. For the same reason, the current case fails to meet the third prong of the public interest exception in that there is no indication that the issues presented "will evade appellate review in future live controversies." *Gurley,* 361 S.W.3d at 414.

The issues as presented in Blacksher's cases were only able to evade review after this Court issued an order allowing those cases to be resolved. While the majority opinion is correct that the "public interest" exception allows an issue that would otherwise be moot to be addressed by this Court "if there is some legal principle at stake not previously ruled as to which judicial declaration can and should be made for future guidance," op. at 603, this is only true if that issue and the underlying facts of the case qualify it under the exception. In the current matter that is not the case;[2] therefore, this Court does not have the discretion to address the oth-

---

**2.** As the majority opinion concedes, neither party in this proceeding sought to challenge or test the validity of 18 CSR 10–4.010, and the majority opinion, therefore, does not at-

tempt to resolve that issue but gratuitously provides that an interested party could seek a declaratory action to challenge the overall validity of 18 CSR 10–4.010. Op. at 597–98.

er issues presented by the Commission's writ petition.

To the extent that the majority opinion directs circuit courts as to how they should handle their dockets when the public defender's resources are nearing their capacity, it is merely advisory in nature. *See* op. at 611 (stating that "[t]he trial court should hold meetings in which the stakeholders undertake a good faith effort to develop strategies that will avoid the need to invoke the protocol, or will alleviate the need to continue operating under the protocol where it already has been invoked."). While this advice may be helpful, in my view, it unwisely abandons this Court's "long-established practice of refusing to render advisory opinions[.]" *Int'l Tel. and Tel. Corp. v. Smith,* 687 S.W.2d 194, 195 (Mo. banc 1985). Instead, the majority opinion provides an advisory opinion, which is disfavored by Missouri law and was recently condemned by this Court. *State ex rel. Proctor v. Messina,* 320 S.W.3d 145, 154 n. 6 (Mo. banc 2010). To render what is purely an advisory opinion "is outside this Court's authority." *City of Springfield v. Sprint Spectrum L.P.,* 203 S.W.3d 177, 188 (Mo. banc 2006).[3]

Furthermore, even if the majority opinion were correct that the "public interest" exception applies and its opinion were not advisory in nature, its analysis, which relies on the potential conflict created by

District 31's appointment to represent Blacksher, is out of line with this Court's previous decisions holding that a potential conflict is not enough to preclude effective assistance of counsel. *See Cooper,* 356 S.W.3d 148; *Krupp,* 356 S.W.3d 142. In *Cooper,* this Court recognized that "the mere existence of a possible conflict of interest does not automatically preclude effective representation." 356 S.W.3d at 155 (citing *Helmig v. State,* 42 S.W.3d 658, 680 (Mo.App.2001)). Instead, to prove that counsel's representation of a defendant violated his Sixth Amendment rights, an actual conflict of interest must be demonstrated. *State v. Roll,* 942 S.W.2d 370, 377 (Mo. banc 1997). "In order to prove a conflict of interest, something must have been done by counsel, or something must have been forgone by counsel and lost to defendant, which was detrimental to the interests of defendant and advantageous to another." *Cooper,* 356 S.W.3d at 155.

In Blacksher's cases, there is no evidence that he suffered any adverse effects due to his representation by District 31. He has not alleged that he received ineffective assistance of counsel. He only received a suspended execution of sentence after being charged with three felonies and pleading guilty to two of those felonies. No evidence was presented that his choice to plead guilty was coerced by his counsel nor was any evidence presented that

---

**3.** An advisory opinion in this case may prove no more helpful than the well-intentioned dicta contained in this Court's opinion in *Pratte,* 298 S.W.3d at 886–89, which was the most recent decision from this Court addressing the problem of the presumed underfunded public defender system. The underfunding of the public defender system may be beyond the competence of this Court in the sense that the role of this Court is to decide cases—not fix problems. When courts try to fix problems, unanticipated consequences sometimes lead to further confusion and complications. In deciding cases, this Court does have to declare the law. The constitution requires the state to provide certain indigent accused with defense counsel. This state has passed a statute that obligates the public defender's office to satisfy this state's obligation to provide indigent accused with counsel when required by the constitution. When there is a conflict between obligations provided by statutes or regulations, the constitution is the supreme law and must be honored. Every set of facts that may be presented in future cases cannot be predicted; therefore, I am hesitant to opine an anticipated solution that would apply to every future scenario.

Blacksher's representation by counsel was affected adversely by District 31's caseload. Because Blacksher's case did not go to trial, there certainly can be no allegations that his counsel was ineffective at that stage. Because of these facts, any conflict that the majority opinion seeks to prevent is potential in nature and, therefore, not actual grounds for Blacksher's counsel to be found ineffective pursuant to *Cooper* and *Krupp.*

## CONCLUSION

For the foregoing reasons, the issues presented in the Commission's writ petition were moot after Blacksher pleaded guilty to and was sentenced for two counts and the third count was dismissed; therefore, the preliminary writ should have been quashed and this cause dismissed.