

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| TRI-COUNTY COUNSELING<br>SERVICES, INC., et al., | ) | |
| | ) | |
| | ) | |
| Appellants, | ) | **WD82751** |
| v. | ) | |
| | ) | **OPINION FILED:** |
| | ) | **March 3, 2020** |
| OFFICE OF ADMINISTRATION, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Richard G. Callahan, Judge**

**Before Division One:** Thomas N. Chapman, Presiding Judge, and
Mark D. Pfeiffer and Anthony Rex Gabbert, Judges

In this appeal, an unsuccessful bidder appeals a judgment denying its challenges to state contract awards made under Missouri's procurement laws.

Tri-County Counseling Services, Inc. doing business as Family Facets and its executive director Sheila Searfoss (collectively "Family Facets") appeal the judgment of the Circuit Court of Cole County, Missouri ("trial court"), partially granting motions to dismiss of Office of Administration, Division of Purchasing ("OA"), and the Department of Social Services ("DSS") (collectively "State"), and Intervenor Cornerstones of Care ("Cornerstones") relating to certain counts of Family Facets' First Amended Verified Petition ("Petition") and the First Amended

Cross-Claim of Intervenor Great Circle, a Missouri not-for-profit corporation ("Great Circle"), and otherwise ruling in favor of the State on all remaining counts after a bench trial. We affirm.

**Factual and Procedural Background**

On September 13, 2017, the State issued a Request for Proposal, No. RFPS30034901800623 ("RFP"), seeking seventeen separate contracts for Intensive In-Home Services (IIS), Intensive Family Reunification Services (IFRS), and Training Services at seventeen different project sites throughout Missouri. The RFP required, among other things, the provision of a certain number of IIS Specialists at each project site. The minimum qualifications of an IIS Specialist as set forth in the RFP required an individual with a college degree or a professional license or designation, and multiple years of experience, as well as the ability to respond twenty-four hours per day, seven days a week.

The RFP contained several scored categories, including the following: Cost (eighty maximum points); Vendor's Experience and Reliability, Expertise of Personnel ("Experience") (thirty maximum points); Method of Performance ("Performance") (eighty maximum points); MBE/WBE Participation (ten maximum points); and the Sheltered Workshop Preference ("Sheltered Workshop") (ten preference points).

The Experience and Performance categories were subjectively and comparatively scored by three evaluators from DSS, and the remaining categories, including the Sheltered Workshop category were scored objectively by OA. The RFP set out specific evaluation criteria for the subjective categories and specific information to be provided related to that evaluation criteria. In performing the subjective evaluations, the evaluators considered each site separately, comparing the proposals for each site and scoring them based on their subjective judgment as to the relative merits of each offeror's proposal in relation to each other and the evaluation criteria. The Sheltered

2

Workshop preference points were available to qualifying bidders in accordance with section 34.165 of the Revised Statutes of Missouri.[1] Vendors that qualified for Sheltered Workshop preference points were to receive ten points and those that did not were to receive zero points. In the other categories, vendors could receive none, all, or some of the available points for the category, and the highest rated vendor in each category was to receive the maximum points possible for the category.

Eleven vendors submitted bids including proposals for multiple project sites in response to the RFP, including Family Facets, Great Circle, and Cornerstones. Family Facets' proposal committed to sheltered workshop participation, indicating that it would use IIS Specialists to be hired and employed directly by Lake Area Industries, an organization that operated a sheltered workshop, to perform some of the services required by the RFP. After the initial review of Family Facets' proposal, the State concluded that the proposal included adequate documentation of use of a sheltered workshop and awarded ten preference points to Family Facets for each site it bid on, except one for failure to submit properly completed paperwork. The arrangement between Family Facets and Lake Area Industries was memorialized in a Memorandum of Understanding ("MOU") between the parties, but was not provided to the State as part of Family Facets' initial proposal.

In April 2018, after the proposals received were evaluated, the State tallied each vendor's total scores for each of the sites. On April 23, 2018, the State issued Notices of Award for each site, awarding contracts to three vendors: Family Facets (eight sites: 733, 736, 738, 739, 831, 932, 933, and 936); Great Circle (five sites: 732, 735, 737, 931, and 935); and Cornerstones (four sites: 731, 734, 740, and 934).

---

[1] All statutory references are to the REVISED STATUTES OF MISSOURI 2016, as updated through the 2017 Cumulative Supplement.

Two bid protests followed the award of the contracts. Family Facets' protest addressed multiple issues with evaluations of the proposals of Family Facets, Great Circle, and Cornerstones for sites 732 and 735. Great Circle's protest challenged the award of Sheltered Workshop points to Family Facets for Sites 732, 733, 738, 739, 831, 932, and 933.

Family Facets' proposal scored .27 and 3.65 points behind Great Circle on Sites 732 and 735, respectively, on the Evaluation Report. Family Facets' protest was based on its claims that: accreditation was improperly considered by the evaluators because accreditation was not specifically mentioned in the RFP; the improper analysis of implementation time frames; and the inconsistent point allocations for method of performance when the method of performances proposed did not vary from site to site. Each point of Family Facets' protest expressly mentioned sites 732 and 735 and requested relief only for these sites.

In response to Family Facets' protest, the State sustained the protest, cancelled the complained-of contracts, issued an Amended Notice of Award to Great Circle to reflect the protest relief granted, and opened the procurement process on the complained-of sites for rebid.

In the response to Great Circle's protest, the State sustained the protest, deducted the Sheltered Workshop points previously granted to Family Facets and re-scored the points awarded without Family Facets receiving the ten Sheltered Workshop preference points on its proposals. Following the re-scoring of the Family Facets points, OA determined that the best vendor proposal for sites 733, 831, 932, and 933 was Cornerstones. The State issued an Amended Notice of Award to Family Facets reflecting the results of the Great Circle protest.

Family Facets filed its eight-count Petition in the trial court, which alleged, in relevant part, that the State violated the procurement requirements of section 34.165 and 1 CSR 40-1.050(10) [2016] by disallowing Sheltered Workshop preference points (Count II), by materially changing

4

the points awarded to Family Facets after the time for submission of bids had closed, rather than rebidding the contracts for the four sites "taken" from Family Facets (Count III), by unfairly, unreasonably, arbitrarily and capriciously determining Experience points by improperly considering offeror accreditation (Count IV), by unfairly, unreasonably, arbitrarily and capriciously calculating Performance points by improperly evaluating implementation schedules and varying scores among the different sites even though the proposed method of performance did not vary from site to site (Count VI), and by awarding the contract to a non-responsive vendor because Cornerstones' proposal failed to provide information for community resources on three sites and did not mention an implementation date for one (Count VII), and therefore requested injunctive relief, including a temporary restraining order and preliminary injunction on all counts (Count VIII).[2] Great Circle intervened and filed a First Amended Cross-Claim ("Cross-Claim"). Cornerstones was also granted leave to intervene.

A bench trial was held, as well as argument on motions to dismiss filed by the State and by Cornerstones against Family Facets' Petition and Great Circle's Cross-Claim.[3] Subsequently, the trial court issued its judgment, which included dismissals of Counts III, IV, VI, and VII on the grounds that Family Facets failed to exhaust available administrative remedies, partially dismissed Count VIII to the extent that it was derivative of Counts III, IV, VI, and VII, and issued findings of fact and conclusions of law ruling in favor of the State on Count II "since Family Facets was not entitled to the sheltered workshop preference of Section 34.165, RSMo, the denial of the preference points to Family Facets was reasonable, and not arbitrary or capricious[,]" and likewise ruled in favor of the State on Count VIII to the extent that it was derivative of Count II.

Family Facets timely appeals.

---

[2] Counts I and V were dismissed prior to trial.
[3] Great Circle's Cross-Claim was dismissed and Great Circle has not appealed from that dismissal.

**Statutory and Regulatory Framework**

The procurement of services by the State of Missouri is governed by Chapter 34. Section 34.050 provides that "[t]he commissioner of administration shall make and adopt such rules and regulations, not contrary to the provisions of this chapter, for the purchase of supplies and prescribing the purchasing policy of the state as may be necessary." Section 34.165.3 authorizes further rulemaking by the commissioner of administration, mandating that he or she "shall make such rules and regulations regarding specifications, quality standards, time of delivery, performance, bidding preferences, and other relevant matters as shall be necessary to carry out the purpose of this section." Pursuant to the authority delegated in section 34.050, as well as section 34.165.3, the commissioner of administration has made and adopted rules and regulations governing purchasing and materials management by the State in Division 40 of the Code of State Regulations. Among these, "[t]he procedures for solicitation, receipt of bids, and award and administration of contracts by the State are set forth in 1 CSR 40-1.050[.]" *Office of Admin. v. Pharmacy Corp. of Am.*, 586 S.W.3d 318, 324 (Mo. App. W.D. 2019).

1 CSR 40-1.050(10) [2016] provides the procedure for implementing the sheltered workshop preference required by section 34.165:

> (10) Section 34.165, RSMo, provides for a ten- (10-) point bonus on bids/proposals submitted by . . . qualified sheltered workshops, if the participating organization provides the greater of two percent (2%) or five thousand dollars ($5,000) of the total contract value of bids/proposals for a purchase not exceeding ten (10) million dollars.
>
>> (A) The bonus points can apply if the bidder/offeror is a qualified . . . sheltered workshop or if the bidder/offeror is subcontracting with [a] . . . sheltered workshop.
>>
>> (B) Supplies provided by [a] . . . sheltered workshop must provide a commercially useful function that offers added value to a contract. Supplies shall be provided exclusive to the performance of a contract, and the organization's obligation outside of a state contract shall not be

considered an added value. Services or supplies to be provided by an organization that are outside the usual and customary business of the organization may be considered not to offer added value.

1. An organization performs a commercially useful function when it is responsible for executing a distinct element of the work of the contract and is carrying out its responsibilities by actually performing, managing, or supervising the work involved. To perform a commercially useful function, the organization must also be responsible, when applicable, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself.

2. To determine whether an organization is performing a commercially useful function, the division may evaluate the amount of work subcontracted, whether the amount the organization is to be paid under the contract is commensurate with the work it is actually performing and the organization's credit claimed for its performance of the work, and other relevant factors.

3. An organization does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of an organization's participation. In determining whether an organization is such an extra participant, the division may examine similar transactions, particularly those in which organizations do not participate.

1 CSR § 40-1.050 also sets forth the mandatory procedure for seeking administrative review of an award of a contract by the State:

(9) A bid or proposal award protest must be submitted in writing to the director or designee and must be received by the division within ten (10) business days after the date of award. If the tenth day falls on a Saturday, Sunday, or state holiday, the period shall extend to the next state business day. A protest submitted after the ten (10) business-day period shall not be considered. The written protest should include the following information:

(A) Name, address, and phone number of the protester;

(B) Signature of the protester or the protester's representative;

(C) Solicitation number;

(D) Detailed statement describing the grounds for the protest; and

(E) Supporting exhibits, evidence, or documents to substantiate claim.

A protest which fails to contain the information listed above may be denied solely on that basis. All protests filed in a timely manner will be reviewed by the director or designee. The director or designee will only issue a determination on the issues asserted in the protest. A protest, which is untimely or fails to establish standing to protest, will be summarily denied. In other cases, the determination will contain findings of fact, an analysis of the protest, and a conclusion that the protest will either be sustained or denied. If the protest is sustained, remedies include canceling the award. If the protest is denied, no further action will be taken by the division.

1 CSR § 40-1.050(9) [2016].

## Analysis

### Points I and II - Sheltered Workshop Preference

In its first and second points on appeal, Family Facets argues that it was entitled to the ten-point sheltered workshop preference provided for in section 34.165 and 1 CSR 40-1.050(10)(B), because Family Facets asserts that its proposals satisfied all statutory workshop preference requirements and any additional requirements imposed by rules and regulations promulgated by the State's commissioner of administration were unenforceable.

On appeal of a circuit court's decision in a non-contested case, our review is of

the judgment of the circuit court, rather than the decision of the administrative agency. As such, our review is essentially the same as for other judgments in a judge-tried case. In reviewing a judge-tried case, we are governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), and we will affirm the decision of the trial court unless it is not supported by substantial and competent evidence, is against the weight of the evidence, or erroneously declares or applies the law.

*State ex rel. Christian Health Care of Springfield, Inc. v. Mo. Dep't of Health & Senior Servs.*, 229 S.W.3d 270, 275 (Mo. App. W.D. 2007) (citation omitted) (internal quotation marks omitted).

Section 34.165 requires the State to give a bidding preference "for products and services manufactured, produced or assembled in . . . sheltered workshops holding a certificate of approval

8

from the department of elementary and secondary education pursuant to section 178.920." A "sheltered workshop" is "an occupation-oriented facility operated by a not-for-profit corporation, which, *except for its staff, employs only persons with disabilities* and has a minimum enrollment of at least fifteen employable persons with disabilities[.]" § 178.900(3) (emphasis added). The "staff" of a sheltered workshop is expressly limited by statute to "employees of a sheltered workshop engaged in management, work procurement, purchasing, supervision, sales, bookkeeping, and secretarial and clerical functions." § 178.900(4).

Here, it is undisputed that no persons with disabilities that are otherwise employed by Lake Area Industries would be providing any products or services relevant to the state contracts at issue; instead, the only "employee(s)" of Lake Area Industries that would be providing anything of value to the relevant state contracts would be IIS Specialists that Lake Area Industries would "hire" and "pay," but each IIS Specialist "hire" was subject to pre-approval by Family Facets, each "hire" would be supervised by Family Facets, Family Facets retained the authority to withdraw approval for any such "hire," and Family Facets would directly pay Lake Area Industries for one thing: "providing" IIS services by IIS Specialists. This arrangement is nothing more than Family Facets using Lake Area Industries' sheltered workshop certification as a straw-person entity to give the appearance of sheltered workshop "participation" when, in reality, the arrangement was nothing more than a financial "pass-through" in order for Family Facets to attempt to qualify for the sheltered workshop preference.

First, though there is little doubt that Lake Area Industries had, in the past, operated as a sheltered workshop as that term is defined in sections 178.900(3)-(4), upon "hiring" IIS Specialists for use in providing services in the relevant state contracts, Lake Area Industries could no longer "wear the hat" of "sheltered workshop" in that IIS Specialists meeting the highly specialized

9

requirements set forth in the RFP—a college degree or a professional license or designation, and multiple years of experience, as well as the ability to respond twenty-four hours per day, seven days a week—would not qualify as a person with disabilities nor an employee of the sheltered workshop engaged in management, work procurement, purchasing, supervision, sales, bookkeeping, or a secretarial or clerical function. And, because Lake Area Industries no longer qualified as a statutory "sheltered workshop," Family Facets could not obtain sheltered workshop preference points by employing Lake Area Industries.

Likewise, Family Facets' argument that "sheltered workshops usually and customarily engage in business activities in addition to the services provided by their handicapped employees" is misplaced in the factual context of this case. While a not-for-profit corporation certified to operate a sheltered workshop may "usually and customarily engage in business activities in addition to the services provided by their handicapped employees[,]" as discussed above, the statutes make clear that employees of a *sheltered workshop* consist of "only persons with disabilities" "except for its staff," which consists of only employees "engaged in management, work procurement, purchasing, supervision, sales, bookkeeping, and secretarial and clerical functions." Hence, any services provided by IIS Specialists employed by Lake Area Industries were *not* services provided by a sheltered workshop.

1 CSR 40-1.050(10), previously referenced with particularity, which provides the procedure for implementing the sheltered workshop preference required by section 34.165, clarifies the distinction expressed in the statute that the preference is for services and products of the *sheltered workshop*, not just any business touching the not-for-profit corporation that operates it.

10

Lake Area Industries was a general not-for-profit Missouri corporation certified to operate a sheltered workshop by the Department of Elementary and Secondary Education pursuant to section 178.900 *et seq*. Prior to its interactions with Family Facets, Lake Area Industries had *not* provided IIS/IFRS services and had *not* employed IIS specialists and would not otherwise provide such services beyond the employment of the Family Facets IIS Specialists. Lake Area Industries would have to hire new employees to provide IIS/IFRS services for Family Facets' contracts with the State. As such, the services to be provided by Lake Area Industries did not qualify for the Sheltered Workshop preference in that the regulation requires such services to "provide a commercially useful function that offers added value to a contract" and "the organization's obligation outside of a state contract [(here, the actual operation of its sheltered workshop by persons with disabilities,)] shall not be considered an added value. Services . . . to be provided by an organization that are outside the usual and customary business of the organization [(here, the provision of IIS Specialists)] may be considered not to offer added value." 1 CSR § 40-1.050(10)(B) [2016].

Under the MOU governing the arrangement between Family Facets and Lake Area Industries, Family Facets and Lake Area Industries would enter into a contract for each of the project sites for which Family Facets was awarded a contract. Under each contract, Lake Area Industries IIS Specialists would provide intensive in-home services twenty-four hours a day, seven days a week each month. For each of the project sites, Lake Area Industries would interview, select, negotiate and set the salary for, hire, employ, and pay a designated number of IIS Specialists who would provide IIS services under the contract. Family Facets retained the authority to approve in advance each IIS Specialist before Lake Area Industries would be paid for their services and could withdraw its approval at any time. Family Facets would submit the individual personnel

11

data to the Children's Division, would exclusively supervise IIS Specialists in performance of IIS program functions, and would require IIS Specialists to follow all policies and procedures of Family Facets. Family Facets would provide the IIS Specialists with a cell phone, laptop, email address, and company car from the Family Facets fleet, procedure and program manuals, necessary office supplies, direct individual reimbursement for personal funds expended for necessary and approved expenses, and the option to enroll in health insurance on the same terms and conditions as other Family Facets employees. The financial agreement was that Lake Area Industries was to be paid directly by Family Facets for the IIS services provided by the IIS Specialists. Lake Area Industries was free to pay the IIS Specialists at rates that were less than, equal to or more than the designated annual salary cap rate established by Family Facets; however, Family Facets would only reimburse Lake Area Industries based upon Family Facets' annual salary cap.

Based upon these facts, the services to be provided by Lake Area Industries did not qualify for the Sheltered Workshop preference in that the regulation requires such services to "provide a commercially useful function[.]" Lake Area Industries would not be providing a commercially useful function under the State contracts because it would not be "responsible for executing a distinct element of the work of the contract and [carry] out its responsibilities by actually performing, managing, or supervising the work involved." 1 CSR § 40-1.050(10)(B)(1) [2016]. Further, the arrangement memorialized in the MOU showed that Lake Area Industries' "role [would be] limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of an organization's participation," which precludes application of the Sheltered Workshop preference, as well. 1 CSR § 40-1.050(10)(B)(3) [2016].

12

Finally, Family Facets' assertion that "1 CSR 40-1.050(10), as applied, is unenforceable to the extent it imposes substantive conditions on entitlement to the sheltered workshop preference not found in section 34.165" fails as well. "[A]dministrative regulations are entitled to a presumption of validity and may 'not be overruled except for weighty reasons[.]" *Union Elec. Co. v. Dir. of Revenue*, 425 S.W.3d 118, 124 (Mo. banc 2014) (internal quotation marks omitted). "Rules and regulations are valid unless unreasonable and plainly inconsistent with the statute under which the regulation was promulgated." *State ex rel. Mo. Pub. Def. Comm'n v. Waters*, 370 S.W.3d 592, 602 (Mo. banc 2012) (internal quotation marks omitted). A party challenging a rule has the burden "'to show that [it] bear[s] no reasonable relationship to the legislative objective.'" *Id.* at 603 (quoting *Foremost-McKesson, Inc. v. Davis*, 488 S.W.2d 193, 197 (Mo. banc 1972)). "Administrative rules should be reviewed in light of the evil they seek to cure and are not unreasonable merely because they are burdensome." *Id.* at 602 (internal quotation marks omitted). A rule or regulation is void only where it conflicts with a statute, goes beyond the scope of the authority the legislature conferred on the rulemaking agency, or if it attempts to extend or modify a statute. *Brown v. Mo. Bd. of Prob. & Parole*, 517 S.W.3d 24, 26-27 (Mo. App. W.D. 2016).

"Chapter 34 gives the State's commissioner of administration broad purchasing authority on behalf of the State." *Lee's Summit License, LLC v. Office of Admin.*, 486 S.W.3d 409, 418 (Mo. App. W.D. 2016). "Section 34.030 provides that the commissioner of administration 'shall purchase all supplies for all departments of the state, except as in this chapter otherwise provided.'" *Id.* "'Supplies' is defined by section 34.010.6 to 'be deemed to mean, supplies, materials, equipment, contractual services, and any and all articles or things.'" *Id.* at 418-19. "The Chapter 34 bidding procedures also include section 34.050 which provides that '[t]he commissioner of administration shall make and adopt such rules and regulations, not contrary to

13

the provisions of this chapter, for the purchase of supplies and prescribing the purchasing policy of the state as may be necessary.'" *Id.* at 419. Chapter 34 also mandates a bidding preference for "products and services manufactured, produced or assembled in" sheltered workshops in section 34.165, and provides that the commissioner "shall make such rules and regulations regarding specifications, quality standards, time of delivery, performance, bidding preferences, and other relevant matters as shall be necessary to carry out the purpose of this section." §§ 34.165.1, 34.165.3.

One such rule is 1 CSR 40-1.050, addressing procedures for the solicitation and receipt of bids and the awarding and administration of contracts. 1 CSR 40-1.050(10)(B) delineates the limits of the preference as it provides: "Supplies provided by . . . [a] sheltered workshop must provide a commercially useful function that offers added value to a contract." Clarifying and defining the appropriate application of the preference was "not contrary to the provisions of [chapter 34]" and was "necessary to carry out the purpose of [section 34.165]." §§ 34.050, 34.165.3. Plainly, delineating the application of the sheltered workshop preference to bids for Chapter 34 State contracts is authorized by statute, as it is authorized by a rule lawfully promulgated pursuant to sections 34.050 and 34.165.3. *Lee's Summit License, LLC*, 486 S.W.3d at 419.

The trial court did not err in ruling in favor of the State on Counts II and VIII regarding the determination that Family Facets was not entitled to the Sheltered Workshop preference points. Points I and II are denied.[4]

---

[4] Family Facets relies on *Information Technologies, Inc. v. St. Louis County*, 14 S.W.3d 60, 65 (Mo. App. E.D. 1999), a case interpreting section 34.073, which requires bidding preferences for the award of state contracts to Missouri firms, corporations, and individuals. However, the "Missouri resident" preference identified by section 34.073 is much more general in application than the specificity attached to the "sheltered workshop" preferences set forth in section 34.165. Furthermore, the *Information Technologies* court did not note any duly promulgated rules or regulations regarding the interpretation or application of section 34.073, whereas section 34.165.3 specifically authorizes the commissioner of administration to make rules and regulations "regarding

**Points III, IV, and V - Dismissal for Failure to Exhaust Administrative Remedies**

In its third, fourth, and fifth points on appeal, Family Facets asserts that the trial court erred in dismissing Counts III, IV, VI, VII, and VIII for failure to exhaust administrative remedies.

Our standard of review for the granting of a motion to dismiss is *de novo*. *McDonald v. Chamber of Commerce of Independence*, 581 S.W.3d 110, 113 (Mo. App. W.D. 2019) (citing *Avery Contracting, LLC v. Niehaus*, 492 S.W.3d 159, 161-62 (Mo. banc 2016)). "'In determining the appropriateness of the trial court's dismissal of a petition, an appellate court reviews the grounds raised in the defendant's motion to dismiss.'" *Id.* at 114 (quoting *Goldsby v. Lombardi*, 559 S.W.3d 878, 881 (Mo. banc 2018)). We will not reverse the trial court's ruling unless the motion to dismiss cannot be sustained on any ground.[5] *Id.*

Following trial, the State moved to dismiss all counts of Family Facets' Petition because "All counts fail to state a claim upon which relief can be granted, because Family Facet[s] failed to exhaust administrative remedies by not filing a protest against the contract award to Cornerstones of Care on sites 733, 831, 932, and 933[.]" The trial court dismissed Counts III, IV, VI, VII, and VIII on this basis as raised in the motion.

1 CSR § 40-1.050(9) provides the mandatory procedure for seeking administrative review of an award of a contract by the State, requiring that: "A bid or proposal award protest must be

---

specifications, quality standards, time of delivery, performance, bidding preferences, and other relevant matters as shall be necessary to carry out the purpose of this section" § 34.165.3, which has been done and further clarifies application of the sheltered workshop preference (1 CSR 40-1.050(10) [2016]). Both of these important distinguishing aspects are more thoroughly discussed in our analysis in today's ruling. Accordingly, Family Facets' reliance upon *Information Technologies* is misplaced.

[5] On appeal, Cornerstones asserts other grounds upon which the trial court should have dismissed Family Facets' petition below. Cornerstones also asserts in its briefing that the trial court erred in failing to dismiss *all* of the claims asserted by Family Facets below—though Cornerstones did *not* file a cross-appeal or motion to dismiss the present appeal and, instead, only made these arguments in its briefing to this court. First, given our ruling today that the trial court did not err in dismissing certain of Family Facets' counts below, we deem Cornerstones' alternative arguments for dismissal to be moot. Second, to the extent that Cornerstones seeks dismissal of the remainder of the present appeal, we deny such request for dismissal.

submitted in writing to the director or designee and must be received by the division within ten (10) business days after the date of award." The rule also expressly limits the scope of the disposition of such a protest: "The director or designee will only issue a determination on the issues asserted in the protest." 1 CSR § 40-1.050(9) [2016]. In the event that a protesting party disagrees with the disposition following such administrative review, section 536.150.1 provides for judicial review of the State's ruling:

> When any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance shall have rendered a decision which is not subject to administrative review, determining the legal rights, duties or privileges of any person, . . . and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action, and in any such review proceeding the court may determine the facts relevant to the question whether such person at the time of such decision was subject to such legal duty, or had such right, or was entitled to such privilege, and may hear such evidence on such question as may be properly adduced, and the court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion; and the court shall render judgment accordingly, and may order the administrative officer or body to take such further action as it may be proper to require; but the court shall not substitute its discretion for discretion legally vested in such administrative officer or body, and in cases where the granting or withholding of a privilege is committed by law to the sole discretion of such administrative officer or body, such discretion lawfully exercised shall not be disturbed.

Because section 536.150.1 provides a right to judicial review when an agency decision is "'not subject to administrative review[,]'" it requires that a party exhaust its administrative remedies prior to seeking judicial review in non-contested cases. *State ex rel. Robison v. Lindley-Myers*, 551 S.W.3d 468, 472 (Mo. banc 2018) (quoting § 536.150.1).

The purpose of requiring the exhaustion of administrative remedies is the preservation of "the efficiency in the relationships between agencies and the courts." *Coleman v. Mo. Sec'y of State*, 313 S.W.3d 148, 154 (Mo. App. W.D. 2010). This court explained in *Coleman*:

> Agencies have a special expertise. A factual record can be more fully developed by pursuing the designated channels for relief with the agency, or a matter may be resolved by the agency, rendering review by the court unnecessary. In addition, the exhaustion of remedies doctrine is rooted in policy considerations designed to encourage agencies to correct their own errors and to compile the record for purposes of judicial review.

*Id.* (citations omitted).

Family Facets cites to non-binding precedent, 73 C.J.S. *Public Administrative Law and Procedure* § 129; *Mazariegos-Paiz v. Holder*, 734 F.3d 57, 63 (1st Cir. 2013), to argue it should benefit from the principle stated therein that: "The administrative exhaustion requirement is satisfied as to particular issues when the agency, either on its own initiative or at the behest of some other party to the proceedings, has addressed those claims on the merits regardless of which party raised the issue or even if the agency raised it sua sponte." On this ground, Family Facets argues that since it specifically argued that State evaluators had improperly considered certain factors as to specific complained-of sites it and others protested during the protest period, those arguments should be deemed "exhausted" as to any number of other sites that were *not* submitted as a protest to the State during the administrative appeal.

However, Family Facets fatally misconstrues the scope of the State's decisions regarding the protests before it. 1 CSR § 40-1.050(9) expressly limits the scope of the State's disposition of a protest brought under the rule: "The director or designee will only issue a determination on the issues asserted in the protest."

Here, Family Facets' protest challenged only the awards for sites 732 and 735 and made no mention of sites 733, 831, 932, or 933. As such, the State's ensuing decision was limited to the issues Family Facets argued in its protest as to sites 732 and 735 only. Moreover, the State did not have before it, and thus had no reason or opportunity to consider, Family Facets' arguments, only later made in its petition to the trial court that, for sites 733, 831, 932, and 933, consideration of

17

accreditation in evaluation of the Experience category was improper, evaluation and scoring of implementation schedules was improper, and evaluation and scoring of the Performance category was improper. Great Circle's protest was made on the ground that Family Facets was improperly awarded the Sheltered Workshop preference on all sites for which it was awarded a contract (sites 732, 733, 738, 739, 831, 932, and 933) and argued that the points should be removed and the awards made accordingly. As such, the State did not have before it, and thus had no reason or opportunity to consider, Family Facets' argument in its petition that, rather than removing the preference points and making the awards accordingly as requested by Great Circle, the proper remedy was to rebid the contracts for those sites. It is only "[w]here no adequate remedy lies through the administrative process" that "the court will not require exhaustion." *Premium Standard Farms, Inc. v. Lincoln Twp. of Putnam Cty.*, 946 S.W.2d 234, 237 (Mo. banc 1997); *State ex rel. Mo. Parks Ass'n v. Mo. Dep't of Nat. Res.*, 316 S.W.3d 375, 388 n.12 (Mo. App. W.D. 2010).

Because Family Facets failed to show that it exhausted its administrative remedies that were available to it or that it should be deemed to have done so, the trial court did not err in dismissing Counts III, IV, VI, VII, and VIII, in part, for failure to exhaust administrative remedies.

Point III is denied.[6]

Family Facets contends, in the alternative, that it was "not required to exhaust administrative remedies under the futility exception to [the exhaustion of administrative remedies] doctrine in that OA fully considered and decided all the issues which form the basis for Counts III,

---

[6] Family Facets again cites to precedent, *Alhalabi v. Missouri Department of Natural Resources*, 300 S.W.3d 518 (Mo. App. E.D. 2009) and *Jeffery v. St. Louis Fire Department*, 506 S.W.3d 394 (Mo. App. E.D. 2016), that is inapposite, as this precedent addresses the application of the Missouri Human Rights Act—which is to be construed liberally for the sake of remediating human rights violations against frequently unsophisticated parties—as opposed to the distinct context of the present case: experienced, sophisticated parties competing for multiple complex state contracts for highly specialized services.

IV, VI, VII and VIII in its decisions on the two bid protests before it." This argument critically misunderstands the nature of the futility exception. The futility exception requires consideration of the *authority and ability* of the administrative body to provide an adequate remedy, not the *subjective* likelihood of it doing so. *Bartlett v. U.S. Dep't of Agric.*, 716 F.3d 464, 472-73 (8th Cir. 2013) ("An administrative remedy will be deemed futile if there is doubt about whether the agency could grant effective relief."); *Duncan v. Mo. Bd. for Architects, Prof'l Eng'rs & Land Surveyors*, 744 S.W.2d 524, 531 (Mo. App. E.D. 1988) (reasoning that because "[a]dministrative agencies lack the jurisdiction to determine the constitutionality of statutory enactments[,] . . . [r]aising the constitutionality of a statute before such a body is to present to it an issue it has no authority to decide" and concluding that "[t]he law does not require the doing of [that] useless and futile act" in that context.).

Family Facets argues that because "OA's determination of Family Facets['] initial protest addressed the issues in Counts II, IV, VI and VII directly" and the State "defended OA's actions on the merits at the trial court[,]" to require them to exhaust administrative remedies by filing a protest to the awards of sites 733, 831, 932, and 933 would be to force them "to raise the same issues on the same set of facts arising under the same RFP" and would be "the epitome of a useless and futile act." However,

> [w]e cannot assume that consequence. Such a position is unsound in principle and unsupported by the authorities. To countenance such view would break down the rule of exhaustion of remedies. There is always the possibility that the action of the administrative board may render resort to the courts unnecessary, for it might correct the error complained of at a hearing under its rules. The exhaustion rule has been held to be applicable, even though the litigant may believe that his petition to the administrative agency will be denied and consequently his attempt would be futile.

19

*State ex rel. Scott v. Scearce*, 303 S.W.2d 175, 180 (Mo. App. 1957). Furthermore, as discussed in our analysis of Point III, we disagree with Family Facets' characterization of the scope of the State's determination of Family Facets' protest.

Because Family Facets failed to show it was not required to exhaust administrative remedies under the futility exception to the exhaustion of administrative remedies doctrine, the trial court did not err in dismissing Counts III, IV, VI, VII, and VIII, in part, for failure to exhaust administrative remedies.

Point IV is denied.

Family Facets argues in its final point that it was "not subject to an exhaustion requirement in that the OA protest procedure applies only to an award of a contract, not the amendment of an award already made[.]" 1 CSR § 40-1.050(9) requires that "[a] bid or proposal award protest must be submitted in writing to the director or designee and must be received by the division within ten (10) business days after the date of award." Family Facets offers no convincing rationale or legal authority for differentiating between an "initial" award made following the submission of bids and an "amended" award made following a protest. As such, this unsupported argument on appeal is deemed abandoned. *Lattimer v. Clark*, 412 S.W.3d 420, 423 (Mo. App. W.D. 2013) ("A contention that is not supported with argument beyond conclusions is considered abandoned."); *Martin v. Summers*, 576 S.W.3d 249, 257 n.12 (Mo. App. W.D. 2019) ("If a party does not support contentions with relevant authority or argument beyond conclusory statements, the point is deemed abandoned.").

Family Facets further argues in its final point that "the protest procedure is not the type of remedy that is subject to the exhaustion requirement" because it is not legislatively mandated and the legislature did not originally entrust the determination to the agency. Although Chapter 34

20

does not expressly set forth the administrative review provided for by the protest procedure, it does expressly provide the Office of Administration broad rulemaking authority to govern the "purchase of supplies and prescribing the purchasing policy of the state as may be necessary," so long as it is "not contrary to the provisions of [chapter 34]." § 34.050. Pursuant to that authority, the Office of Administration promulgated rule 1 CSR 40-1.050(9), which mandates, in part: "A bid or proposal award protest must be submitted in writing to the director or designee and received by the division within ten (10) business days after the date of award." The rule prescribing the award protest procedure is not contrary to any provision of Chapter 34. Because the protest procedure rule was duly promulgated within the authority provided in section 34.050, it has the force and effect of law. *United Pharmacal Co. of Mo. v. Mo. Bd. of Pharmacy*, 159 S.W.3d 361, 365 (Mo. banc 2005) ("'[R]ules promulgated by an administrative agency with properly delegated authority have the force and effect of law.'"). Only in the event that a party has exhausted the administrative review provided for in the protest procedure under 1 CSR 40-1.050(9) does section 536.150.1 provide for judicial review of the State's decision on the protest:

> When any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance shall have rendered a decision *which is not subject to administrative review*, determining the legal rights, duties or privileges of any person, . . . and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action . . . .

(Emphasis added.)

Because Family Facets was subject to an exhaustion requirement in that the protest procedure rule applies to an amended award of a contract and the protest procedure is the type of remedy that is subject to the exhaustion requirement because it is legislatively authorized and has the force and effect of law, the trial court did not err in dismissing Counts III, IV, VI, VII, and VIII, in part, for failure to exhaust administrative remedies.

21

Point V is denied.

## Conclusion

The judgment of the trial court is affirmed.

/s/ *Mark D. Pfeiffer*

Mark D. Pfeiffer, Judge

Thomas N. Chapman, Presiding Judge, and Anthony Rex Gabbert, Judge, concur.